Durfee, Judge,
delivered the opinion of the court:
Plaintiff, a New Jersey corporation, alleged three counts in its petition pertaining to two different contracts. Sub *742 sequent to trial and the filing of the Report of the Commissioner, plaintiff elected to discontinue any further action with respect to the first two counts. We are therefore now concerned only with count three of the petition which relates to a contract awarded plaintiff for the supply of mountain sleeping bags to the Army.[1]
Plaintiff was awarded Contract No. DA 30-280-QM-23627 by the New York Quartermaster Procurement Agency, U.S. Army, on January 17,1952. Under the terms of the contract, plaintiff was to furnish 58,000 sleeping bags to defendant. Shipment was to be made F.O.B. Bayonne, New Jersey, with tentative destinations of the bags to be Schenectady, New York and Auburn, Washington. Included in the contract was the usual disputes clause and a clause which provided for Government approval of all subcontracting. The latter clause read as follows:
25. Names and location oe factories
The names and locations of the factories where manufacture of the items bid upon will be performed are set forth herein. The performing of any of the work contracted for in any place other than that named herein is prohibited, unless the same is specifically approved in advance by the Contracting Officer. If the Contracting Officer approves the use of any additional plant or factory by the Contractor in the performance of the work hereunder, extra costs to the Government (including extra costs in the transportation of property furnished by the Government for fabrication hereunder, as a result thereof) will be charged to the Contractor. Full responsibility for the fulfillment of the contract will remain with the Contractor.
The only name and location of a factory set forth in the contract was that of plaintiff’s plant in Bayonne, New Jersey.
On March 7, 1952, plaintiff wrote the New York Quartermaster Procurement Agency and requested that it be allowed to subcontract the sleeping bags to be shipped to Auburn, Washington (approximately 29,000 in number) to a California company. Plaintiff stated in the letter that “* * * it would reflect a considerable saving to the Govern *743 ment to have the F.O.B. point of the bags for Auburn, Washington, at Los Angeles.”
Defendant replied through the Contracting Officer on May 26, 1952. The letter in part reads:
* * * * *
Information currently available to this office indicates that deliveries to West Coast destinations are scheduled to commence July 1952. Shipping documents will be issued to effect this change in f.o.b. point for deliveries scheduled to a West Coast consignee. [Emphasis supplied.] * * *
Modification 1 of the contract was then issued on June 20, 1952. It provided in part:
Contract is hereby amended to provide for
SubcoNTRactiNG by — Reed Feather Co., 1917 Bay St., Los Angeles, Calif, who will perform the filling closing and shipping operations for 28,048 Bags, Sleeping, Mountain, scheduled for shipment to West Coast destinations, beginning July 1952 through December 1952. No additional cost to Government.
Reason: Request of contractor in order to facilitate delivery.
Thereafter, a dispute arose in October 1952 between plaintiff and its California subcontractor, the Reed Feather Company. As a result of the dispute the subcontract was cancelled.[2] By letter dated October 20, 1952 plaintiff advised the contracting officer that it had reached agreements with two Brooklyn, New York companies for the filling by each company of 14,024 sleeping bags. The contracting officer replied the next day, advising plaintiff that “in the event the proposed subcontractual arrangement [the Brooklyn subcontracts] is approved by this office any and all increased costs to the Government resulting therefrom shall be borne by you [plaintiff].” By letter of October 30, plaintiff wrote the contracting officer that “We wish to express our willingness to bear any extra costs that may be incurred by reason of the change of F.O.B. point.” Plaintiff also stated that it believed there would be no extra costs since the original *744 bid was evaluated on tbe basis of Bayonne, New Jersey as the shipping point. The subcontracts to the Brooklyn companies were approved on November 21,1952, by letter of that date on the condition that plaintiff “* * * bear any and all increased costs including transportation costs by reason of the change in shipping points from F.O.B. Los Angeles, California to F.O.B. Brooklyn, New York.” Modification 6 to the contract, issued on January 27,1953, incorporated the change in subcontractors under the contract and provided: '
* * * * *
This subcontracting is permited .only on condition that any and ail increased costs to-the Government as a result of change in F.O.B. point from Los Angeles, California, to Brooklyn, New York, shall be borne by the prime contractor.
After deliveries on the sleeping bags from Brooklyn had begun, defendant subtracted from its remittances under the contract a sum equal to the difference in shipping costs from Brooklyn and from Los Angeles to Auburn, Washington. Plaintiff objected to this procedure, stating that, defendant should not be allowed the advantageous Los Angeles rate. Plaintiff reasoned that since the Brooklyn rate was identical to the Bayonne rate (the rate at which the contract was originally awarded), the Government had not incurred any excess shipping costs. The contracting officer disagreed. He believed that under Modification 1 to the contract, the Government received a right to the lower freight costs from Los Angeles to destination. Therefore, when the F.O.B. point was changed to Brooklyn by Modification 6, the resulting freight rate from Brooklyn to Auburn, Washington, that defendant had to pay, rather than the lower rate from Los Angeles to Auburn, Washington, resulted in an excess cost to defendant which had to be borne by plaintiff under the terms of the contract.
The Armed Services Board of Contract Appeals affirmed the contracting officer’s decision. The Board found that under Modification 1 the delivery point of the contract for the bags to be shipped to Washington was F.O.B. Los Angeles. Thereafter, the change of delivery point to F.O.B. Brooklyn resulted in an increased cost to defendant. Plain *745 tiff was therefore held liable for the excess transportation costs.
At that juncture, plaintiff brought suit in this court for relief under the contract. Throughout this suit the parties have rigidly adhered to their original positions — plaintiff contending that there was no change in the F.O.B. point as a result of Modification 1, and defendant maintaining that it became entitled to the lower Los Angeles rate under Modification 1.
There is, however, an additional dispute that concerns the standard the court may use in reviewing the Board’s decision. The parties'are at variance in their delineatiotís of questions of fact arid law,' as found by the Board. Plaintiff' seems to feel that the whole dispute concerned an interpretation of contract terms, a question of law, and. therefore under Beacon Construction Co. of Massachusetts v. United States, 161 Ct. Cl. 1, 314 F. 2d 501 (1963), not subject to the narrow standard of review imposed by the Wunderlich Act, 68 Stat. 81, 41 U.S.C. 321 (1964 ed.). Defendant defends the finality and jurisdiction of the Review Board, maintaining the decision of the Review Board is purely a factual one and therefore final unless the decision is arbitrary, capricious, grossly erroneous, or riot supported by substantial evidence, citing the Wunderlich Act, supra, and United States v. Carlo Bianchi & Co. Inc., 373 U.S. 709 (1963).
Another foray by this court into the furrowed field of fact-law distinction is not necessary in this case, however. Whether the Board’s decision be one of fact, law, or mixed fact and law does not matter here. What does matter is that this court in applying the most liberal or most stringent standard of review is in agreement with the Board’s decision. The Board found that under Modification 1 to the contract, the F.O.B. point was changed to Los Angeles, giving the Government the benefit of the lower freight charges. Plaintiff contests this point on the ground that there was no mention of an F.O.B. change in Modification 1. While it is true that the magic words “F.O.B. Los Angeles” were not included in the Modification, it must be remembered that “in the case of contracts the avowed purpose and primary function of the court is the ascertainment of the intention of *746 the parties.” Williston on Contracts, Third Edition, section 601. Union Pacific Railroad Co. v. United States, 10 Ct. Cl. 548 (1874), affirmed United States v. Union Pacific Railroad Co., 11 Ct. Cl. 1, 91 U.S. 72 (1875). Additionally, this court has held that the interpretation of a contract by the parties to it before the contract becomes the subject of controversy is deemed to be of great, if not controlling weight. Houston Ready-Cut House Company v. United States, 119 Ct. Cl. 120, 96 F. Supp. 629 (1951). In other words, the court may look at the contemporaneous construction given to the contract by the parties. The Board apparently applied the contemporaneous construction rule in finding that Modification 1 changed the F.O.B. point to Los Angeles. Both parties knew that under Section 25 of the contract, supra, any subcontracting was to be approved by the contracting officer. Plaintiff, therefore, by letter of March 7, 1952, requested the privilege of subcontracting. As an inducement to the Government to allow the subcontracting, it told the Government that there would be a considerable saving in shipping to the Government if the F.O.B. point was changed to Los Angeles. By letter of May 26, 1952 the Government agreed to plaintiff’s proposal and specifically stated that shipping documents would be issued to effect the change in F.O.B. point. Surely, these facts show that the parties intended the F.O.B. point to be changed to Los Angeles. In light of these circumstances, the fact that the words “F.O.B. Los Angeles” did not appear in Modification 1 is not controlling. The parties intended the F.O.B. point to. be changed, and this court, like the Board will not allow their proven intention to be thwarted by a technicality.
Plaintiff’s main contention, lack of consideration for the condition attached to Modification 6, therefore fails.[3] Plaintiff’s position is grounded on the premise that there was no change in F.O.B. point to Los Angeles by the issuance of Modification 1. We have shown this point to be in error. Since the pre-Modification 6 F.O.B. point was Los Angeles, definite consideration existed for the condition attached to *747 Modification 6. Plaintiff received a definite benefit — the right to subcontract to the Brooklyn companies (there is evidence in plaintiff’s exhibits that the Government was contemplating terminating the contract for default at that time). In return, plaintiff agreed to pay the difference in shipping costs. Consideration, therefore, flowed both ways.
Plaintiff has raised an alternative argument for the court’s consideration. Plaintiff argues that had it requested that it be allowed to perform the remainder of the contract in its plant in Bayonne rather than Brooklyn, it would have incurred no liability. Plaintiff reasons that the provisions of Paragraph 25 of the contract, supra, imposing extra costs, applies only when the contracting officer approves the use of any additional plant. Since Bayonne was already listed in the contract, it was not an additional plant, and therefore, even if the F.O.B. point had been changed to Los Angeles by Modification 1, a subsequent change back to Bayonne would not result in a price reduction. Since, as plaintiff continues, the shipping costs from Brooklyn are identical to the shipping costs from Bayonne, there should likewise be no price reduction as a result of the change to Brooklyn.
There are some loose ends which untie plaintiff’s argument, however. First, plaintiff fails to realize that the right to lower shipping costs to defendant became vested at the time Modification 1 was approved. A change back to Brooklyn or Bayonne did not work to give defendant the cost reduction; Modification 1 had done that. Instead, the change constituted a cost increase for which plaintiff was liable. Second, once Modification 1 changed the place of manufacture for the West Coast destined sleeping bags to Los Angeles, Bayonne did in fact become an additional plant for that portion of the contract. Therefore, a subsequent change back to Bayonne could be allowed only by approval of the contracting officer, and then presumably only on condition of liability for extra costs. Third, in any event, plaintiff has not shown it could have produced the prior subcontracted portion of the contract at Bayonne. It must be remembered that at the time the Brooklyn subcontracts were approved, plaintiff had not yet delivered any of the 28,048 sleeping bags to Auburn, Washington. Plaintiff was *748 in serious danger of being defaulted, and presumably the reason two plants were chosen in Brooklyn was that the contract would be completed faster by using two facilities rather than one.
We therefore agree with the conclusion drawn by the Armed Sex-vices Board of Contract Appeals that plaintiff was obligated to pay the excess costs assessed. Plaintiff is not entitled to recover, and its petition is dismissed.
FINDINGS OF FACT
The court, having considered the report of Trial Commissioner Bichard Arens, and the briefs and argument of counsel, makes findings of fact as follows:
1. This case arises out of two contracts entered into by plaintiff with defendant as follows:
(a) Supply contract No. N383s-80253 awarded to plaintiff under date of September 22, 1952, by the U.S. Navy Aviation Supply Office, Philadelphia, Pennsylvania, for certain aerial tow targets, at an aggregate contract price of $350,797.36; and
(b) Supply contract No. DA 30-280-QM-23627 awarded to plaintiff under date of January 17, 1952, 'by the Quartermaster Procurement Agency, U.S. Army, New York, New York, for certain mountain sleeping bags, at an aggregate Contract price of $1,198,570.
2. (a) The first and second Counts of the petition relate to the tow target contract. Plaintiff claims that it incurred excess costs because of delays in the performance of the contract which plaintiff asserts were caused by defendant.
(b) The third Count of the petition relates to the sleeping bag contract. Plaintiff claims that defendant wrongfully deducted from the contract price certain shipping costs.
3. (a) Plaintiff, a New Jersey corporation, with its principal place of business at Bayonne, New Jersey, was organized in 1950 by Mr. Luther Bice, plaintiff’s president, and by Mr. William E. Chase, plaintiff’s vice president, both of whom had been officers of a predecessor firm, Dorsett Furniture Company of Manhattan, New York, which was organized in 1933 and liquidated in 1949.
(b) Prior to the award of the contracts out of which arise *749 the instant suit, Mr. Chase and Mr. Nice had extensive experience in manufacturing for the armed forces various equipage items requiring material fabrication, but had no experience in the manufacture of tow targets. As president of plaintiff company, Mr. Rice was in charge of all production.
Tow Target CoNtract
4. (a) On August 19,1952, there was issued from the Navy Aviation Supply Office, Philadelphia, Pennsylvania, an invitation for bids for the furnishing and packaging of 13,236 Mark 23 tow targets in accordance with certain specifications and drawings.
(b) In response to the foregoing invitation, plaintiff, under date of September 2, 1952, submitted its bid to defendant. In filling out the bid form, plaintiff represented that it was a manufacturer of the supplies (tow targets) bid upon. In preparing its bid, plaintiff estimated that it would devote approximately 90 percent of its total plant space to the work under the contract; that the initial setup work would be accomplished by the middle of October 1952, at which time a total production force of 65 to 70 employees would be working; that the first production sample would be ready by the beginning of November 1952; and that all items would be completed by February 15, 1953. Plaintiff’s cost estimates were based on the assumption that production would build up to 350 units per day and that the workers would be paid on a piecework basis.
(c) Under date of September 22,1952, plaintiff, the lowest bidder, was awarded the contract.
5. (a) Under the provisions of the contract deliveries of 25 percent of the contract quantity were to be made'within 90 days of the contract date (i.e., by December 22,1952) and final deliveries were to be completed within 90 days thereafter (i.e., by March 22,1953).
(b) The contract provided that inspection of the tow targets would be made at plaintiff’s plant by the Inspector of Naval Materiel who was designated as the authorized representative of the Contracting Officer. The contract specifications required that a sample target, selected by the Inspector from each lot of 500 targets manufactured, be shipped *750 to the appropriate Government test facility for flight testing.
(c) The contract contained provisions for termination by the Government for default by plaintiff and for termination for the convenience of the Government.
6. (a) Immediately after the contract was awarded plaintiff set up its equipment to produce the tow targets.
(b) In October 1952 plaintiff produced a series of pilot targets in order that its employees could become familiar with the manufacturing operations and so that the pilot targets could be checked against the specifications.
(c) By the middle of November 1952 plaintiff had 20 employees working on the tow target contract and had completed 10 preproduction samples. Pursuant to a request by plaintiff, the Inspector of Naval Materiel sent an inspector to inspect the preproduction samples. The inspector spent 2 days in plaintiff’s plant checking the preproduction samples against the specifications. In the course of the checking a question arose in the mind of the inspector respecting the positioning of a reinforcement within the tow target. Whereupon, the inspector held up acceptance of the preproduction samples, and under date of November 24, 1952, plaintiff sent a letter to the Contracting Officer, the body of which reads:
Before entering into the production of Tow Targets on the. above contract, we would like to have one or two items in the construction of the target clarified.
On' page 4, figure 1 of the above specifications an undetermined number of pieces of tape %" or 1" by 8.5" long are required to be zig-zag stitched to the internal panel assembly and the sleeve assembly. How many pieces of tape are required and what are their exact locations?
On page 6, figure 8 of the same specifications an enlarged section of the main figure called view B-B is shown calling for another piece of tape %" or 1" by 8.0" long with zig-zag stitching. However, the origin of this section is not indicated on the main figure. How many pieces of tape are required in this case and what are their exact locations ?
It would be a great help if we were able to see a sample target at some location.
Therefore we would really appreciate your advice as to when and where a completed Tow Target could be seen.
*751 (d) On the same date, November 24, 1952, plaintiff wrote to the U*.S. Navy Aviation Supply Office that plaintiff’s supplier of rayon wire bearing cloth would be unable to make delivery to plaintiff until January 1953, that plaintiff’s final delivery to defendant would accordingly be about 30 days behind the schedule called for in the contract, and that plaintiff “would appreciate * * * additional time because of this unexpected delay.”
(e) Plaintiff suspended production the latter part of November 1952 and laid off all except a few key personnel. As appears hereinafter (finding 7(b)), plaintiff did not resume production until February 2,1953. In the interim, plaintiff did not have any information clarifying the question regarding the positioning of the reinforcement.
(f) The body of a Naval Speedletter dated December 15, 1952, addressed to plaintiff from the Contracting Officer reads:
Kefer your letters signed W. E. Chase dated 24 November 1952. One MK 23 Target is being forwarded to the Contractor under separate cover in order to clarify methods of fabrication.
In view of the circumstances, January 1953 delivery will be acceptable.
7. (a) As of February 1, 1953, plaintiff had fabricated about 3,000 targets which were practically completed but could not be actually completed without resolution of the question of the positioning of the reinforcement.
(b) On February 2, 1953, plaintiff received the sample target which it had requested of the Contracting Officer on November 24,1952. The sample target showed that the positioning of the reinforcement as it appeared in plaintiff’s preproduction samples was correct.[1] On this date plaintiff resumed production with 20 employees working on the targets, and gradually increased the number of such employees to 65.
8. (a) On February 9, 1953, the Inspector of Naval Materiel selected from plaintiff’s production the first flight test sample target. The Inspector misdirected the target to *752 Wright-Patterson Air Force Base, Dayton, Ohio, which, was not the proper testing facility.
(b)On March 11,1953, plaintiff sent a telegram to the Inspector of Naval Materiel urging that every effort be made to secure the results of the flight test on the sample target which the Inspector of Naval Materiel had sent to Wright-Patterson Air Force Base. Plaintiff outlined in the telegram its “distressing position” while awaiting the results of the flight test. Plaintiff did not receive a reply to the telegram.
9. (a) During February and March 1953, plaintiff produced about 3,000 tow targets.
(b) On April 2, 1953, plaintiff was notified that the flight tests were to be conducted at the Naval Air Test Center, U.S. Naval Air Station, Patuxent River, Maryland. On that date the Inspector of Naval Materiel selected at random one sample from each of six production lots of 500 targets. These samples were delivered by automobile on the same day to the above Naval Air Test Center.
(c) On April 3,1953, plaintiff again suspended production and laid off all except a few key personnel while it awaited the results of the flight tests.
(d) The body of a letter dated April 6, 1953, addressed to the Aviation Supply Office from plaintiff reads:
On Thursday April 2nd. Mr. Robert Rice delivered six representative tow target production samples to the U.S. Naval Testing Center at Patuxent River, Md.
He was fortunate in being able to talk to Commander Ben jes and Capt. L. L. Blackburn, United States Marine Corps.
These men advised us that under normal priorities our targets would require about six weeks for the first test ana perhaps as much as three months, especially if testing for Radar is a requirement. Testing all six seems completely out of the question.
Captain Blackburn states that their facilities are overtaxed beyond comprehension.
Should it appear that the testing of samples will cause an-indefinite delay in our manufacturing program, we shall find it necessary to apply for immediate relief, financially, in order to help our suppliers.
We shall be forced to permit Cheney Bros, and Hyman Fabrics Company to deliver all of the cloths they now have prepared.
*753 This will require approximately $200,000.00 which we will have to ask the Government to advance.
Needless to say any trust agreements that may be required by the Government to protect its interest will be properly executed.
We must insist on immediate action in any direction that may relieve the pressure we are getting from all sides.
10. (a) On April 20, 1953, the Naval Air Test Center at Patuxent River, Maryland, received from the Bureau of Aeronautics the project directive for the testing of plaintiff’s tow targets.
(b) On April 23,1953, the flight tests were conducted.
(c) On May 27, 1953, the Naval Air Test Center sent to the Chief, Bureau of Aeronautics, a report of the flight tests reading in part as follows:
METHODS OF TESTS
5. Each target was launched from the rear hatch of a JD-1 airplane at an indicated airspeed of 105 knots and 11,000 feet pressure altitude. Tests were conducted using a cable scope of 1,500 feet and an indicated airspeed of 260 knots. This air speed was maintained for a minimum of 20 minutes. It was necessary to maintain approximately 300 to 500 feet per minute rate of descent to maintain the specified 260 knots. After completion of the -tests, the targets were cut from the tow cable at an altitude of approximately 200-300 feet and recovered for inspection.
6. All tests were observed from an accompanying airplane.
RESULTS AND DISCUSSION
7. The results of the tests conducted on each sample were as follows:
a. Lot #1 — Launching was satisfactory. As the airspeed was increased, the target assumed an “S” shape. Above 200 knots the target developed an oscillation which increased in amplitude as the airspeed was increased. At 260 knots the amplitude of oscillation was approximately 10 to 15 feet. After two minutes at 260 knots, the air speed was decreased to and maintained at 245 knots for the remaining 18 minutes of flight to prevent loss of the target from excessive oscillation. The target showed no evidence of failure or distortion of the *754 nose ring or bridle. No evidence of tearing of the sleeve panels, or distortion or ripping of the seams was apparent.
b. Lot #2 — Launching was satisfactory. As the air speed was increased, the target developed a snaking oscillation. At 240 knots, the target rotated violently and tore loose from the tow cable.
c. Lot #3 — Launching was satisfactory. The target did not oscillate, surge or rotate at air speeds up to 260 knots. Post flight inspection revealed no damage to the target.
_ d. Lot #4 — Launching was satisfactory. After a flight duration of 10 minutes at 260 knots, the breech of the target blew out.
e. Lot #5 — This target was tom on the JD-1 launching hatch precluding completion of tests.
f. Lot #6 — Launching was satisfactory. The target did not oscillate, surge or rotate at air speeds up to 260 knots. Post flight inspection revealed no damage to the target.
8. The sample from Lot #5 has been replaced by the contractor prior to the submission of this report. Test results of this target will be submitted in a later report.
CONCLUSIONS
9. It is concluded that:
a. Samples tested from production lots #3 and #6 were satisfactory.
b. Samples tested from production lots #1, #2, and #4 were unsatisfactory.
c. Production lots #3 and #6 are satisfactory and production lots #1, #2, and #4 are unsatisfactory if the results of tests are evaluated as prescribed in reference (b).
d. When production lots are tested as specified in reference (b), the results are inconclusive because the sample size (one) from each lot is insufficient to determine the quality of the entire lot.
e. If the five targets tested may be considered as a sample of the total of the lots each represents, it can be estimated that approximately 40% of the production targets meet the requirements of reference (b). This sample size, however, is so small that very little confidence can be ascribed to this estimate.
f. Flight tests of a sufficiently large sample of these targets to give such tests significance would be very slow and expensive.
*755 g. The targets tested were generally satisfactory at indicated airspeeds below 200 knots.
10. The replacement sample from lot #5 has not yet been tested.
BECOMMFNDATIONS
11. It is recommended that:
a. Lots #3 and #6 be accepted for service use.
b. Lots #1, #2 and #4 be rejected as unsatisfactory since the samples tested from these lots do not conform to the specifications set forth in reference (b).
c. The specifications for these targets as set forth in reference (b) be rewritten, omitting the requirements for flight tests of production control samples.
(d) Subsequent to the foregoing flight tests, another sample target from lot 5 was given a flight test on May 26,1953, with satisfactory results.
(e) On June 5, 1963, plaintiff received its first flight test report.
11. (a) In June 1953, plaintiff resumed production of the tow targets and continued in production until August 1953 (finding 13(d), infra). During this period plaintiff produced another 9,000 tow targets.
(b) Beginning in June 1953, plaintiff submitted to defendant target samples for flight tests at fairly regular intervals but the flight test reports did not reach plaintiff until 4 to 8 weeks after the samples were submitted.
12. (a) On June 15, 1953, flight tests were conducted on three samples tow targets. The results were satisfactory on two of the targets and unsatisfactory on one.
(b) On June 30, 1953, flight tests were conducted on two sample tow targets and the results were satisfactory on both.
(c) On July 27,1953, flight tests were conducted on three sample tow targets. The results were satisfactory on two of the targets. With reference to the third target (lot 9) the summary of the flight test reads, “Post flight inspection revealed target tom. Considered no test.”
13. (a) Under date of August 11,1953, plaintiff was notified by defendant regarding the flight test on lot 9 as follows:
You are informed that 500 Tow Targets, MK 23, lot #9 (report 14 WM dtd. 6/25/53) Specification MILT-7045 dated 8 Jan 1951, type II (with flotation strips) *756 on Contract N383s-80253 with Chase & Eice, Inc., Bayonne, N.J., contractor, is rejected for the following reasons:
Lot #9 — Launching was satisfactory. Target was towed for 20 minutes at an indicated airspeed of 260 knots and appeared to be stable at all times. However, a post flight inspection revealed that the breech of the target had blown out and it was ripped almost its entire length.
Please notify this office when you expect to submit replace material for inspection. All correspondence relative to this rejection should refer to above File Number.
Any appeal from this rejection should take the form of a letter addressed either to or via this office, such letters to be forwarded in quadruplicate in order that the original may be forwarded to the ultimate authority for final decision, and the carbon copies retained in the files of this office.
(b) Lot 9 had been received by defendant from plaintiff at the Naval Air Test Center at Patuxent Eiver, Maryland, on July 2,1953.
(c) During the latter part of August 1953, flight tests were conducted on seven sample tow targets. The results were satisfactory on three of the targets and were unsatisfactory on four of the targets which blew out in flight.
(d) In the latter part of August 1953, after being notified that flight tests on four sample tow targets were unsatisfactory, plaintiff again suspended production. By this time plaintiff had produced approximately 12,000 tow targets.
14. During September 1953, flight tests were conducted on eight sample tow targets. The results were satisfactory on four of the targets and were unsatisfactory on four of the targets.
15. (a) On October 21, 1953, following conferences between plaintiff’s and defendant’s representatives respecting the excessive unsatisfactory flight test results, defendant ordered 100 percent inspection of all of the targets awaiting shipment at plaintiff’s plant. This necessitated unpacking an estimated 5,000 targets which were awaiting shipment. Prior to this time, the inspection had been on a sampling basis. This 100 percent inspection commenced in mid-November 1953, and continued until the first week in May 1954. *757 Plaintiff’s vice president, Mr. Chase, testified that during the period of the above inspection there was no production in plaintiff’s plant because “we just simply couldn’t manufacture and pile up a lot of untested and uninspected items,” and “we didn’t have the finances to go into — to continue into any more production.”
(b) As a result of the above inspection, none of the tow targets was rejected.
(c) During the period of the inspection, plaintiff conferred with defendant’s representatives who assured plaintiff “that there would be a price adjustment made to compensate [plaintiff] for all these difficulties.”
16. During December 1953, flight tests were conducted on two sample tow targets. The results were satisfactory on one of the targets and unsatisfactory on the other target.
17. During January, February, and March 1954, flight tests were conducted on seven tow targets and the results were satisfactory on all seven.
18. By letter dated March 19, 1954, addressed to the Aviation Supply Office, Philadelphia, Pennsylvania, plaintiff applied for an amendment to its tow target contract without consideration pursuant to Title II of the First War Powers Act, 50 U.S.C. App. 611. In its letter plaintiff detailed the delays which it had encountered and which it alleged were caused by defendant.
19. On April 19, 1954, a flight test was conducted on a sample tow target with satisfactory results. This was the last flight test conducted on any of plaintiff’s sample tow targets.
20. At the trial, plaintiff adduced testimony to the effect that certain aspects of the flight tests were not properly conducted and that the failures of some samples to pass the flight tests were due to excess speed in the flight tests and/or insufficient permeability of the fabric as specified by defendant. The foregoing testimony was nonexpert and was overcome by the expert testimony adduced by defendant regarding stitching and configuration defects in the sample targets. The evidence does not establish that the failure of any of the samples to pass the flight tests were due to any causes other than the causes assigned by defendant.
*758 21. (a) By letter dated September 8, 1954, addressed to the Finance Officer, Eegional Accounts Office, U.S. Navy, plaintiff requested that all moneys due or to become due under the tow target contract be paid to the District Director of Internal Eevenue, Newark, New Jersey, because of plaintiff’s indebtedness for delinquent taxes.
(b) On September 28, 1954, the Navy Eegional Accounts Office, Philadelphia, Pennsylvania, annotated plaintiff’s tow target contract to the effect that plaintiff was indebted to the Government.
22. On November 16, 1954, the Navy Contract Adjustment Board, having completed its consideration of plaintiff’s application of March 19, 1954 (finding 18, supra), sent to the Aviation Supply Office, Philadelphia, Pennsylvania, a document, the body of which reads as follows:
1. The Navy Contract Adjustment Board has completed its consideration of the subject application submitted to the Board under reference (a). At the request of the Board, the contractor submitted further information under dates of 26 October and 9 November 1954. The Board held hearings on the subject application on 21 October and 2 November 1954, which were attended by an official of the contractor who was afforded full opportunity to be heard.
FACTS DEVELOPED
2. Contract N383s-80253, awarded to the subject contractor on 22 September 1952 pursuant to formal advertising, provides for the manufacture of 13,236 red, black and white aerial tow targets at unit prices of $26.64, $26.58, and $26.08 respectively, or at a total fixed price of $350,797.36. Deliveries of 25% of the contract quantity were to be made within 90 days of the contract date (i.e. by 22 December 1952) and final deliveries were to be completed within 90 days thereafter (i.e. by 22 March 1953).
3. As of the present date, approximately 12,000 tow targets have been delivered, with a balance of almost 1500 targets still to be delivered, and with unliquidated progress payments outstanding in the sum of approximately $29,170. By about April 1954, the contractor was forced to suspend all plant operation for financial reasons.
4. In a letter of 19 March 1954 submitted to the Contracting Officer, the contractor alleged a loss incurred and *759 to be incurred in the sum of $135,422.43, as of 28 February 1954, plus the loss of an anticipated profit of $31,-016.44. The contractor contends that the loss was occasioned by the fact that costs at the time of bid had been estimated on the assumption that deliveries could be completed within the total contract period of six months (as specified in the Invitation for Bids) whereas, because of Government action, the contract was still uncompleted some eighteen months after the scheduled completion date.
5. In substance the contractor contends that excess costs were incurred because of (i) Government delay in securing clarification of contract specifications, so as to enable the contractor to secure approval of a pre-production sample, (ii) Government delay in establishing flight test facilities and in making flight test reports, and (iii) the Government’s insistence in October 1953 on a 100% inspection requirement contrary to contract specifications.
6. The Contracting Officer recommended that the contractor’s application be denied in full on the ground that (i) the contractor continued in production despite Government delays, (ii) the Government made no commitment, written or otherwise, as to the time required for flight tests, (iii) the time required for flight testing was not excessive under the circumstances, and (iv) the 100% inspection requirement was within contract requirements.
7. A summarization of the Government action involved is set forth below.
a. Clarification of Specifications. On 24 November 1952 the contractor requested clarification of the contract specifications so as to identify the location of tape and stitching reinforcement required for the targets and it was not until 2 February 1953, some two months later, that the requested clarification was received. It also appears that the applicable specifications had in fact been amended just prior to contract award so as to clarify the very point in issue, which amendment apparently was unknown to the Navy personnel concerned with the subject contract.
_ b. Government Flight Test Facilities. The specifications require that a sample target, selected by the Navy inspector from each lot of 500 targets manufactured, be shipped to the appropriate Government test facility for flight testing. On 9 February 1953 the Navy inspector selected the first flight test sample but misdirected it to an Air Force test facility and it was not until March 1953 that a Navy test facility (different than that desig *760 nated in the specifications) was established at the Navy Air Test Center, Patuxent, Maryland. On 1 April 1958 the Navy inspector again selected for flight testing sample targets from the contractor’s initial production runs and on 5 June 1953, almost four months after the first flight test sample had originally been submitted, the contractor received its first flight test report. Subsequent flight test reports consumed from four to eight weeks, which was considerably behind the rate of production contemplated by the delivery schedule of the contract.
c. 100% Inspection Requirement. Following the institution of ground testing facilities (240 knots simulated air speed) at Patuxent on 30 September 1953, which disclosed stitching and configuration defects in three of the four sample targets submitted, together with the previous rejection experience under the contract, a 100% inspection of all targets awaiting shipment at the contractor’s plant was ordered by the Navy on 21 October 1953. At this time the Navy inspectors were also given a check list by which to conduct the inspection. The inspection, which necessitated unpacking an estimated 5000 targets awaiting shipment and which consumed several months, forced the contractor to suspend all further production of targets. While the specifications contain a requirement of a so-called “spot” inspection by the Navy inspector of each target “after completion of the assembly and fabrication operation”, the Navy inspector had in fact limited this examination to a 10% sampling operation. On the other hand, the inspection commenced in October 1953 was in addition to the “spot” inspection and was apparently made after the Navy inspector had already passed the targets and the targets had been packed for shipment pending flight tests on the lots involved.
8. The Board is of the view that the Government can be said to have represented in some degree, by the contract requirement for completion within six months, that at least the first flight tests could be completed prior to substantial deliveries under the contract and that subsequent flight tests would likewise be completed within a period of time commensurate with the rate of deliveries called for by the contract. Otherwise, it is obvious that the contractor would be assuming considerable risk in proceeding with substantial production until it at least had obtained clarification of the specifications and had received its first flight test report. As noted above, the contractor did not obtain its first flight test report until *761 some four months after submitting its first flight test sample and over eight months after contract award (which also included over two months’ delay in securing Government clarification of the specifications), and the record discloses that the contractor had in fact operated under a greatly reduced rate of production for the first eight months of the contract. Finally, while not questioning the necessity for the additional inspection instituted in October 1953 as noted above, it would appear that such an additional inspection was not originally contemplated by the Government and that the inspection procedure and check list used by the Navy inspectors in this additional inspection would, if instituted' at the inception of the contract, have minimized the contractor’s inspection and re-work costs under the contract.
9. Operating statements submitted by the contractor for the fiscal years ended 30 April 1953 and 30 April 1954 disclose losses of $138,720 and $103,006 respectively, the loss for the later year being reduced by some $45,000 due to the voluntary reduction in officers’ salaries. An analysis of the contractor’s monthly production and sales figures for the Navy contract and for the contractor’s other work discloses that the fiscal year ended 30 April 1954 corresponds roughly (except for slight start-up work) to the entire period of time the contractor was in production under the subject contract, although not all the loss suffered that year is attributable to the Navy contract.
10. In ascertaining how much of the contractor’s entire loss is due to the Navy contract and how much of the loss suffered under the Navy contract is attributable to the Government action complained of, it is apparent that no precise determination can be made due to differences in the treatment of overhead and because of other variables involved. Moreover, while the Board is of the view that Government action substantially increased the contractor’s costs under the subject contract, the record also discloses increased costs due to production deficiencies and that otherwise the contractor was not diligent in minimizing its losses under the contract.
11. Financial statements submitted by the contractor as of 30 April 1954 disclose current assets of $63,586, current liabilities of $234,837, with a surplus deficiency of $164,148. Payroll and withholding taxes payable to the Government are in the sum of $62,876, which appears to be clearly in excess of the contractor’s assets available for the payment of general creditors. In short, the contractor is in an insolvent position and, if the contract *762 were terminated for default, the contractor would be unable to respond to the Government’s claim for excess costs and unliquidated progress payments (except to the extent of the forced-sale value on some $9757 in inventory pledged to this account).
12. Under all the circumstances of the case, the Board finds that an amendment without consideration in the total sum of $36,000 is warranted, as more particularly set forth below.
FINDING
Based on all the facts of the case the N avy Contract Adjustment Board hereby authorizes an amendment without consideration to contract N383s-80253 with Chase & Bice, Inc., in the total sum of $36,000, based on action by the Government as the other contracting party. While the amount of the excess costs incurred by the contractor as a result of Government action is not susceptible to precise ascertainment, the price adjustment authorized herein is fair and reasonable in the circumstances.
The amendment authorized herein shall provide for the waiver of unliquidated progress payments in the sum presently owed by the contractor (estimated at $29,179), with the remaining approximately $7000 to be placed in a controlled account with withdrawals therefrom limited to actual run-out costs, exclusive of officers’ salaries and deferrable charges, until completion of the subject contract, at which time the balance then remaining may be withdrawn by the contractor in full. The amendment authorized herein shall permit the contractor to bill the present unit price on remaining targets to be delivered under the contract, and shall waive the requirement for flight testing but may include such inspection requirements as shall otherwise be deemed necessary in the Government’s interest.
Finally, the amendment authorized herein shall recite that it is in full settlement of all claims of the contractor based upon Government action involved in the subject application and that all liens as the Government presently has in the contractor’s property shall remain in full force and effect until completion of the subject contract.
The Board finds that its action in this case will facilitate the national defense.
13. In exercising the authority granted herein, the Contracting Officer shall comply with Part III (Contractual Provisions and Becord Bequirements) of the Begulations approved by the Deputy Secretary of De *763 fense on 21 February 1951, as amended. It is requested tbat a copy of the contract amendments executed in furtherance of the authorization herein contained be forwarded to the Board.
23. (a) By letter dated December 16, 1954, plaintiff was notified by the Contracting Officer that the Navy Contract Adjustment Board had made a finding with respect to plaintiff’s application of March 19, 1954 (finding 18, supra), which authorized the Contracting Officer to issue an amendment to the tow target contract “providing for certain waivers and allowances under the specific conditions to be agreed to between the contracting parties.” Plaintiff was requested to arrange to visit the Aviation Supply Office in Philadelphia to discuss the amendment authorized by the Board.
(b) In the latter part of December 1954, plaintiff met with defendant’s representatives in Philadelphia where plaintiff was informed of the contents of the finding of the Navy Contract Adjustment Board. Plaintiff requested defendant’s representatives to commit to writing the conditions of the Board’s finding.
(c) By letter dated December 30, 1954, the conditions of the Board’s finding were specified to plaintiff by the Contracting Officer and plaintiff was requested “to advise whether an amendment to the contract, embodying the conditions of the Board’s finding is acceptable.”
(d) On December 31,1954, the Contracting Officer, Aviation Supply Office, Philadelphia, notified the District Director of Internal Kevenue, Newark, New Jersey, of the November 16, 1954, finding of the U.S. Navy Contract Adjustment Board, and advised the District Director that plaintiff had not yet accepted or rejected the Board’s finding.
24. (a) Under date of January 12, 1955, plaintiff sent a letter to the U.S. Navy Contract Adjustment Board in which plaintiff objected to the amount of the adjustment in contract price ($36,000) found by the Board to be fair and reasonable. Plaintiff stated that its losses on the contract were $187,306.82.
(b) On the same date plaintiff sent a letter to the Aviation Supply Office, the body of which reads:
*764 In a sincere effort to complete the above contract may we make the following suggestion:
1 — The Navy will create a controlled account with the full $86,000.00.
2 — Bepayment of unliquidated progress payments should not, be immediate but amortized in accordance with terms of Modification #2.
3 — Chase & Bice, Inc. will use funds for the sole purpose of completing the contract.
4 — Targets will be manufactured, inspected and shipped as required. Invoices will be paid by the Navy less agreed progress payment liquidation as heretofore.
5 — The officers of the company will not draw compensation but must be paid traveling and sustenance expenses.
6 — The amendment will not “recite that it is in full settlement of all claims of the contractor based upon Government action involved in the subject application and that all liens as the Government presently has in the contractor’s property shall remain in full force and effect until completion of the subject contract.”
25. (a) The body of a letter dated March 17, 1955, to plaintiff from the Contracting Officer, U.S. Navy Aviation Supply Office, reads:
By letter dated 30 December 1954, the Aviation Supply Office furnished your company with the Findings of the Navy Contract Adjustment Board in respect of your application for price relief under Contract N383s-80253, and requested advice as to whether an appropriate amendment, giving effect to such Findings and other conditions stipulated in said letter dated 30 December 1954, would be acceptable to your company and would permit satisfactory completion of the contract.
By letter dated 12 January 1955, your company made certain suggestions as enumerated therein with respect to the conditions under which an amendment to the contract may be accepted. Such suggestions were informally discussed with representatives of the Board and in view of absence of additional facts or evidence concerning your application, the decision of the Board is final. If you desire to have the Board confirm the foregoing, such action will be taken upon request.
It is the conclusion of the Contracting Officer, based upon complete analysis of your suggestions, that such are unacceptable to the Government.
*765 Your attention is invited to the fact that the Contracting Officer has exhausted all channels, within the scope of his authority, to effect settlement of this matter and permit satisfactory completion of the contract. Under the circumstances, unless advice with respect to acceptability or reasons for nonacceptance of the proposal contained in the Aviation Supply Office letter of 30 December 1954 are received within ten days from receipt of this letter by you, it may be necessary for the Government to exercise its rights within the contract provisions.
(b) The body of a responding letter dated March 28,1955, from plaintiff reads:
In connection with the conclusion reached by the Contracting Officer with regards to suggestion made by this Company by letter dated-Jan. 12th, 1955, we seem to have left no other alternative but to accept the terms set forth by the Contract Adjustment Board.
Will you process the necessary papers enabling us to complete this contract, as speedily as possible ? We thank you.
(c) At the trial plaintiff’s vice president, Mr. Chase, testified that plaintiff wrote the foregoing letter of acceptance because plaintiff was under a very severe pressure by the landlord and “* * * because when we finally decided that if this was all we could possibly get out of it on our own, and we had no money to go out and hire legal assistance, that the only thing that we could possibly do was to hope that by accepting this tiling and running out the balance of the contract, we might be able to realize a few dollars out of the ruins of the whole thing, so we figured the only thing to do was to go ahead with the deal.”
26. (a) A letter dated May 4, 1955, to the office of the Director of Internal Revenue, Newark, New Jersey, from the Assistant Purchase Director of the Aviation Supply Office reads in part:
Execution of the Findings of the Board by contract amendment is presently precluded by two factors within the jurisdiction of your office:
(1) The existence of tax lien, upon which the Navy Regional Accounts Office, Washington, D.C. placed this contractor on the Navy Hold-Up List for any further payments until the tax lien was satisfied.
*766 (2) The existence of an agreement between your office and Chase & Rice whereby any payments made by the Navy Department under Contract N383s-80253 could be made directly to Internal Revenue rather than to Chase & Rice.
Specifically it would appear necessary for your office to remove the two foregoing restrictions in order to permit completion of the contract. If such restrictions are not removed, this office would be unable to amend the contract in accordance with the Findings of the Board, with the result that the Navy Department will not receive the unfinished balance of the contract nor will your office receive any payments against tax lien. It is requested that you advise of your concurrence in the removal of both the tax lien and the agreement between your office and Chase & Rice referred to above, or because of the complex nature of this matter, that you have a representative of your Philadelphia Office visit the Aviation Supply Office for further discussion with the Contracting Officer and Counsel.
(b) By letter dated July 26, 1955, to the Assistant Purchase Director of the Aviation Supply Office, the District Director of Internal Revenue of Newark, New Jersey, advised that it was agreeable to the Office of Internal Revenue to release the tax lien on the controlled bank account. The letter also reads in part:
Subsequent deposits into said account are also, by virtue of this authorization, released from said tax. However, at the end of the contract, if there is a surplus in the account said monies are to be delivered to the Internal Revenue Service to be applied to the taxpayers liability. It is also understood as outlined in your communication of 4 May 1955 that the only monies to be considered released from the aforementioned tax lien are those withdrawn subject to the countersignature of the officer in charge of naval inspection.
This letter is also to be considered as nullifying the existing agreement between this office and Chase and Rice whereby any payments made by the Navy Department under contract N383s-80253 could be made directly to the Director of Internal Revenue rather than to Chase and Rice. This is, of course, subject to the restriction regarding the countersignature of the officer in charge of naval inspection as referred to in the preceding paragraph.
*767 (c) The above letter of July 26,1955, was forwarded under date of August 2, 1955, by the Commanding Officer of the U.S. Navy Aviation Supply Office to the Naval Eegional Accounts Office, Washington, D.C., “for information and appropriate action.”
(d) On August 5,1955, the Naval Eegional Accounts Office, Washington, D.C., directed the Aviation Supply Office, Philadelphia, to release the payments under the tow target contract to plaintiff in accordance with the terms set forth in the above letter of July 26, 1955, from the District Director of Internal Eevenue, Newark, New Jersey.
27. (a) On August 19, 1955, the Contracting Officer, U.S. Navy Aviation Supply Office, Philadelphia, sent to plaintiff Modification No. 3 to the tow target contract, which was accepted by plaintiff and which reads:.
This amendment is made pursuant to the authority contained in Title II of the First War Powers Act, as amended, and Executive Order No. 10210, and authority delegated to the Secretary of the Navy by the Deputy Secretary of Defense on 21 February 1951 and redele-gated by the Secretary of the Navy by NCPD 73-51 of 16 March 1951 to the Navy Contract Adjustment Board, and pursuant to the authorization of said Board by letter dated 16 November 1954 and the Contracting Officer’s determination that the National Defense is facilitated by the action taken hereby.
The Contracting Officer finds that relief in the amount of $36,000 is necessary based on action by the Government as the other contracting party, as more fully cited in the said Board’s Findings. In consideration of all the facts of the case, the Board and the Contracting Officer find that an amendment of the subject contract, to the extent herein specified, is deemed fair and equitable. _ The Board has directed that the amendment authorized herein shall provide for the waiver of unliqui-dated progress payments in the sum of $29,178.56, with the remaining $6,821.44 to be placed in a controlled account, with withdrawals therefrom limited to actual run-out costs exclusive of officers’ salaries and deferrable charges, until completion of the subject contract, at which time the balance then remaining may be withdrawn by the contractor in full. This latter provision of the Board’s Finding pertaining to withdrawal of balances remaining in the controlled account following completion of the contract will be effected through means *768 of the procedures hereinafter set forth providing for the payment of such balances toward satisfaction of the contractor’s obligations to the Treasury Department of the United States Government for delinquent tax payments. The Board further directed that this amendment shall permit the contractor to bill the unit price on remaining targets to be delivered under the contract and shall waive the requirement for flight testing, but may include such inspection requirements as shall otherwise be deemed necessary in the Government’s interest. The Board further directed that this amendment shall recite that it is in full settlement of all claims of the contractor based upon Government action involved in the application for relief under Title II of the First War Powers Act with respect to the subject contract, and that all liens as the Government presently has in the contractor’s property shall remain in full forcé and effect until completion of the subject contract.
Accordingly, the subject contract as heretofore amended is hereby further amended to provide the following :
(a) The provisions of Modifications 1 and 2 dated 30 April 1953 and 25 August 1953, respectively, pertaining to the making of progress payments by the Government under the subject contract, are hereby modified, effective as of the date of this amendment, to provide (1) that no further progress payments shall be made under the provisions of such modifications, and (2) that in making payment for articles delivered after the date of this amendment, deductions shall not be made under paragraph (b) of the clause entitled “Progress Payments” included in the contract by said Modifications 1 and 2, and (3) that so long as the contractor is not in default in delivering the remaining articles to be delivered in accordance with the delivery schedule, as hereinafter set forth, the limitation on the amount of outstanding unliquidated progress payments set forth in said Modifications 1 and 2 and the provisions therein regarding the obligation of the contractor to repay such progress payments to the Government shall be inapplicable. All other terms and conditions of such modifications, particularly those applicable to lien or other rights of the Government, shall remain in full force and effect until satisfactory completion of the subject contract by the contractor, at which time, upon written certification by the Contracting Officer or satisfactory completion, un-liquidated progress payments in the amount of $29,178.56 heretofore made under said Modifications 1 and 2 shall *769 be considered waived as an obligation of the contractor to the Government.
(b) Any provisions of the contract or Military Specification MIL-T-7045 dated 8 January 1951 requiring flight testing of the tow targets are hereby waived, provided that the Government, through the cognizant Inspector of Navy Material, may perform such other inspection as he shall otherwise deem necessary in the Government’s interest.
(c) Present contract delivery schedule requirements of undelivered tow targets are hereby deleted, and all undelivered tow targets shall be delivered to the Government within a period not in excess of ninety (90) days from the date of establishment of the Special Bank Account referred to in paragraph (e) hereof.
(d) It is understood and agreed that the assignment of this contract dated 6 November 1952 by the contractor to Jones and Company, 292 Madison Avenue, New York, N. Y., notice of which was acknowledged by the Contracting Officer on 20 November 1952, has been satisfied by letter dated 3 September 1954, signed by Mr. David L. Hollsman, partner of Jones and Company, addressed to the Contracting Officer, Aviation Supply Office, wherein said company has relinquished all right, title and interest in and to moneys due or to become due under the subject contract by reason of the contractor’s repayment of its indebtedness to Jones and Company, assignee, in full.
(e) The Government agrees, upon the transmittal in triplicate by the contractor , to the Contracting Officer of an executed agreement in form acceptable to the Contracting Officer setting forth the rights of the parties with respect to the Special Bank Account hereinafter described, to pay to the contractor by check marked for deposit only in such Special Bank Account the amount of $6,821.44. Such account shall be designated as the “Chase and Eice, Inc. — Navy Department Special Bank Account”, and shall be established in The Broadway National Bank of Bayonne, 522 Broadway, Bayonne, New Jersey, or such other bank as the Contracting Officer may approve. Withdrawals from said Special Bank Account of amounts deposited therein pursuant to this paragraph (e) and the following paragraph (f) shall be made only (i) by check of the contractor, countersigned on behalf of the Government by the Inspector of Naval Material, Naval Industrial Eeserve Shipyard, Building 13, Port Newark, Newark 5, New Jersey, or such other person as he shall designate in writing, hereinafter called the countersigning agent, or (ii) by check *770 signed by the countersigning agent, payable to the Treasurer of the United States, pursuant to paragraph (g) hereof. Withdrawals by checks signed as provided in (i) above shall be limited to actual run-out costs, exclusive of officers’ salaries and deferrable charges, necessary for satisfactory completion of the undelivered quantities as of the date of this amendment. Any interpretation required as to the proper use of funds shall be made in writing by the Contracting Officer.
(f) Payments against invoices for delivery of satisfactory materials hereafter delivered under this contract shall be made by check payable to the contractor and be marked for deposit only in the Special Bank Account referred to above. Payments so made shall constitute payments to the contractor under this contract.
(g) Upon satisfactory completion of the contract, or upon termination thereof by the Government if termination takes place prior to completion, any amounts remaining in the Special Bank Account shall be withdrawn by the countersigning agent to the extent necessary to pay tax indebtedness of the contractor to the United States, and any other outstanding indebtedness of the contractor to the Government. Any amounts remaining in the Special Bank Account over and above the amount of the tax or other indebtedness of the contractor to the Government shall, upon the written release of the Contracting Officer, be paid to the contractor by check signed by the countersigning agent and the contractor.
(h) Notwithstanding any other provision of this contract, the contractor shall not, after the date of this amendment, transfer, pledge, or otherwise assign this contract or any interest therein or any claim arising thereunder, to any party or parties, trust company, bank or other financing institution.
(i) All liens that the Government presently has in the contractor’s property shall remain in full force and effect until completion of the contract.
(j) This amendment is subject to the following clause:
“EXAMINATION OF RECORDS
(a) The contractor agrees that the Comptroller General of the United States or any of his duly authorized representatives shall, until the expiration of 3 years after final payment under this contract, have access to and the right to examine any directly pertinent books, documents, papers, and records of the contractor involving transactions related to this contract.
*771 _ (b) The contractor further agrees to include in all his subcontracts hereunder which may hereafter be made, a provision to the effect that the subcontractor agrees that the Comptroller General of the United States or any of his duly authorized representatives shall, until the expiration of 3 years after final payment under the subcontract, have access to and the right to examine any directly pertinent books, documents,_ papers, and records of such subcontractor involving transactions related to the subcontract. The term ‘subcontract’ as used in this clause excludes (i) purchase orders not exceeding $1,000 and (ii) subcontracts or purchase orders for public utility services at rates established for uniform applicability to the general public.”
(k) The contractor agrees that this amendment is in full satisfaction and settlement of all claims of the contractor based upon Government action involved in the contractor’s application for relief under Title II of the First War Powers Act with respect to the subject contract.
(l) This amendment does not authorize an increase in the amount of the unit price to be paid to the contractor for articles to be delivered under the contract, and the contractor shall bill said articles at the unit price in effect prior to issuance of this amendment. The aggregate contract price for the total quantity of articles specified in the contract is hereby increased by $36,000, from $349,047.36 to $385,047.36, to cover the waiver of unliquidated progress payments in the amount of $29,-178.56 and the payment of $6,821.44 which is to be deposited in the Special Bank Account in accordance with the provisions as above set forth. For Navy accounting purposes, the increase of $36,000 shall be chargeable as follows:
Reqn. 383/29047-24A6/5/56
Bureau Control No. 47000(17)
Appropriation 1761502.90 A&FN 1956
Exp. Acct. 52831
Program 9047
Obj. Cl. 089
If the foregoing is acceptable to you, please indicate your acceptance by signing in the space provided below and returning two signed copies to the Contracting Officer, thus constituting this letter an amendment to subject contract.
*772 (b) As of the same' date,' August 19, 1955, plaintiff and defendant executed an “Agreement For Special Bank Account”, the body of which reads: .
AGREEMENT executed as ni the 19th day of August 1955 between the UNITED STATES OF AMERICA, hereinafter called the Government, represented by the Contracting Officer executing this Agreement; CHASE AND RICE, INC., a corporation under the laws of the State of New Jersey, hereinafter called the Contractor; and THE BROADWAY NATIONAL BANK OF BAYONNE, located at 522 Broadway, Bayonne, New Jersey, hereinafter called the Bank.
WHEREAS, the Government and the Contractor entered into Contract N383s-80253 awarded 22 September 1952, and said parties by supplemental agreement dated 19 August 1955, a copy of which has been furnished to the Bank, have amended said contract so as to provide, among other things, for the deposit in the Special Bank Account in the Bank of certain sums hereafter to be paid by the Government to the Contractor in connection .with such contract; and
WHEREAS, the parties hereto desire to establish hereby the provisions regarding such Special Bank Account:
NOW THEREFORE, in consideration of the foregoing, and for other good and valuable considerations, it is agreed that
1. The. Special Bank Account shall be designated “Chase and Rice, .Inc. — Navy Department Special Bank Account”.
2. All payments under said contract made by check payable to Contractor and marked for deposit in said Special' Bank Account which are received by the Bank shall be credited by the Bank in such Special Bank Account. No part of the funds in such Special Bank Account shall be mingled with other funds of the Contractor prior to withdrawal thereof from the Special Bank Account as hereinafter provided.
3. Withdrawals from said Special Bank Account shall be made only (i) by check of the Contractor countersigned on behalf of the Government by the Inspector of Naval Material, • Naval Industrial Reserve Shipyard, Port Newark, Newark, New Jersey, or by such person as said Inspector of Naval Material shall designate in writing, hereinafter called the Countersigning Agent, or (ii) by check signed by the Countersigning Agent payable to the Treasurer of the United States.
*773 4. The Bank shall not be responsible for the application of funds withdrawn from said Special Bank Account by checks signed as provided in paragraph 3 above.
5. The Government, or its authorized representatives, shall have access to the books and records maintained by the Bank with respect to such Special Bank Account at all reasonable times and for all reasonable purposes, including (but without limiting the generality thereof) the inspection or copying of such books and records and any and all memoranda, checks, correspondence or documents appertaining thereto. Such books and records shall be preserved by the Bank for a period of six (6) years after the closing of the Special Bank Account.
6. In the event of the service of any writ of attachment, levy of execution, or commencement of garnishment proceedings with respect to the Special Bank Account, the Bank will promptly notify the Director of the Purchase Division, Aviation Supply Office, Department of the' Navy, Philadelphia 11, Pa.
7. The Government shall have a lien upon the credit balance in the Special Bank Account to secure the repayment of all progress payments made to the Contractor, which lien shall be superior to any lien or claim of the Bank with respect to said Account.
(c) After the special bank account was opened, plaintiff “had to reorganize and get [its] help back and re-break them in.”
28. During the period beginning August 26,1955, and ending November 17,1955, plaintiff requested withdrawals from the special bank account in the amount of $22,468.71 for material, labor, and miscellaneous expenses. Bequests for withdrawals were made by letters to the Inspector of Naval Materiel and contained supporting data and statements of the then current status of the special bank account. During this same period the Navy approved withdrawals of $22,083.85.
29. The body of a letter dated September 9, 1955, to the Inspector of Naval Materiel, Naval Industrial Shipyard, Newark, New Jersey, from plaintiff reads:
As requested, the following is an approximate budget of the run-out costs to be incurred in the completion of Aerial Sleeve Tow Targets on contract number N383s-80253.
*774 Direct labor_$4,000.00
Indirect labor (floor help shipping room etc.)- 1,000. 00
Material Purchases_ 12, 000.00
Sundries (thread, machine parts etc.)_ 500.00
Packing supplies_ 500.00
Overhead (rent, light, power insurance, transportation, etc. — exclusive of officers’ salaries)_ 4,000.00
Expenses (travel, fares, and mise, petty cash)_ 1,000.00
Total Budget_ 23, 000. 00
Anticipated receipts_ 40, 000. 00
Add original advance_ 6, 821.44
Expected bank balance at completion of Tow Targets should be approximately $23,000.00
30. (a) In November 1955, a Navy auditor visited plaintiff “for the purpose of verifying the costs incurred against the subject contract.” The report of the auditor dated November 28,1955, reads in part:
2. The contractor has no office staff and does not maintain bookkeeping records, therefore the Navy Auditor used whatever supporting data were available under the circumstances. The findings of the Navy Auditor are as follows:

Explanation of Costs Questioned
(1) Direct Labor $8,258.92 — The contractor’s clock cards supporting direct labor charges were incomplete to the extent that the number of hours expended on the subject contract were not properly recorded, nor were the labor rates indicated, therefore, the costs claimed were not susceptible to audit.
(2) Material $50.00 — The contractor was able to present paid invoices for material used in the performance of the subject contract with the exception of one invoice from Silk Screen Co. for $50.00.
(3) Miscellaneous expenses $6,253.83 — The entire amount was questioned as the detail in support of these expenses was in such disorderly condition that *775 the Navy Auditor made no attempt to verify the charges.
3. The Navy Auditor discussed the findings with the contractor’s representative, Mr. Chase, who was not in agreement with the findings of the Navy Auditor. He contended that it was not necessary to maintain a bookkeeping system and reserved further comment pending further discussion with the Contracting Officer.
(b) Plaintiff’s vice president, Mr. Chase, testified that in the latter part of November 1955, defendant refused to countersign the check “for the necessary funds to take care of [plaintiff’s] previous week’s work” and “demanded an audit of the account and all proceedings up to that point”, and that plaintiff didn’t get back into production again until January 27, 1956.
(c) A letter dated April 2, 1956, addressed to the Inspector of Naval Materiel from plaintiff reads in part:
Immediately after production was resumed, we were advised that the appropriation for this contract had expired at the Navy Regional Accounts Office at Philadelphia. All payments had to be routed through I.N.M. Newark, N.J. to N.K.A.O. Philadelphia, to N.E..A.O. Washington, D.C. with accompanying delays enough to cut our production to a point that our few employees left us.
Our labor is now performed entirely by supervisory personnel at an exorbitant cost.
The evidence does not establish the precise duration of the delay because of the circumstances recited in the foregoing letter.
31. (a) On May 14, 1956, plaintiff completed its work under the contract.
(b) During the period beginning August 26,1955, and ending August 15, 1956, plaintiff made withdrawals from the special bank account in the amount of $46,007.76 for material, direct labor, and expenses. Included in the expenses were overhead costs such as rent, insurance, telephone, heat, power, travel, taxes, repairs, and maintenance.
(c) The U.S. Navy Area Audit Office attempted without success to conduct a final audit of plaintiff’s records, and under date of March 12, 1957, made a report to the Com *776 manding Officer of the T7.S. Navy Aviation Supply Office, reading in part:
* * * ^f¿er several attempts to contact Mr. Chase concerning availability of the records, this office was finally advised that all of the contractor’s plant assets were seized and sold by the Bureau of Internal Bevenue for the satisfaction of tax liens.
# * * * #
3. Concerning the accounting records relating to subject contract, Mr. Chase advised that no formal records were kept because the company was financially unable to employ a full time accountant. All substantiating documentation in the form of invoices, payroll records, rent receipts and evidence of payments to vendors cannot be located because of the confusion caused by the sale of the company’s assets. Furthermore, Mr. Chase is reluctant to devote any efforts to locating the required documentation because he attributes the company’s losses and failure to subject contract and says nothing would be gained by an audit at this time.
4. In the circumstances the Navy Auditor will be unable to furnish the Contracting Officer with a final audit report covering costs incurred during the period 28 November 1956 through 11 August 1956. The files of the Inspector of Naval Material, Newark, N.J. contained some details of charges for which withdrawals from the Navy controlled account were made. These have been analyzed and are summarized for the addressee’s information as follows:
Labor_ $9,624.23
Material _ 8, 306.58
Overhead_ 9, 249. 82
$27,180.63
32. From mid-October 1952 until mid-May 1956, 90 percent of plaintiff’s total plant space was set up for production of tow targets under the contract, and was in operational readiness for work under the contract. It does not appear that plaintiff could have utilized any of the space or equipment used for the contract work for production of other items.
33. (a) Plaintiff’s petition, filed with this court on December 5, 1958, alleges damages under Counts 1 and 2 of $800,000. Pursuant to an order issued under Buie 28(b) *777 plaintiff subsequently submitted a schedule of damages under Counts 1 and 2 of $666,562.76. The schedule reflects as damages amounts allegedly due various creditors, loss of company net worth, loss of profit on the contract, and loss of average potential monthly profits plaintiff would have received on other work over a period of some 38 months had it not been delayed on the tow target contract. Defendant reported that an attempted audit revealed that none of the items and figures in plaintiff’s schedule could be verified since plaintiff’s records were no longer available and the alleged losses of profits were estimates without support.
(b) During the trial plaintiff offered no evidence directly in support of the above schedule of damages.
.34. (a) At the trial plaintiff offered, and there was received in evidence, a recomputation of its claim for the period ending October 31, 1954, which had been submitted by plaintiff to the Navy Contract Adjustment Board in late 1954. Plaintiff also offered, and there was received in evidence, an analysis of plaintiff’s overhead for the period beginning November 1,1954, and ending April 30,1955, and for the period subsequent to May 1,1955. The recomputation and analysis are in summary as follows:
(1)For the period ending October 31, 1954:
Materials Used-$227, 782. 05
Labor Employed_ 75,432. 57
Overhead Allocable_ 179,328.29
Estimated Cost to complete Contract (labor and material) _ 29, 757.00
512,299. 91
Less: Contract Receipts for 13,500 tow targets_ 356, 009.53
Excess of Costs over Receipts_ 156,290. 38
Add: Estimated Profit per Original Claim_ 31, 016.44
Loss on the Contract_ 187, 306. 82
(2) For the period beginning November 1, 1954, and ending April 30,1955:
Overhead costs, including several estimated amounts for items of overhead and accrued, but unpaid, officers’ salaries of $25,000- $44, 594. 04
(3) For the period subsequent to May 1, 1955:
Overhead costs as derived from certain canceled checks in plaintiff’s possession, and some estimated amounts for certain items including $50,000 officers’ salaries_,_ $72,343. 57
*778 (b) Plaintiff produced as a witness, Mr. Hyman Simon, a certified public accountant, whose accounting firm bad rendered services to plaintiff from plaintiff’s inception in 1950 through the fiscal year ending April 30, 1955. These services consisted principally of approximate monthly audits of plaintiff’s bank statements, review of entries in plaintiff’s books of accounts, and preparation of plaintiff’s tax returns and annual statements. Mr. Simon produced at the trial copies of several of plaintiff’s profit and loss statements and balance sheets which were “qualified” by a statement to the effect that the amounts appearing thereon were taken from plaintiff’s books of account without outside verification.
(c) Mr. Simon testified that the recomputation for the period ending October 31, 1954, reflecting a loss of $187,-306.82 on the tow target contract (finding 34(a)(1)) was prepared by him for submission to the Navy Contract Adjustment Board in late 1954 and was based on plaintiff’s records as they existed at that time. He stated that the allocation of overhead as shown in the recomputation was made on the basis of an analysis of the items of plaintiff’s then overhead to determine which of the items were applicable to the tow target contract. The record does not adequately reveal the process used by Mr. Simon in arriving at the figures in the recomputation for estimated cost to complete the contract or for estimated profit.
(d) Regarding the period beginning November 1, 1954, and ending April 30, 1955 (finding 34(a) (2)), Mr. Simon testified that while he could not determine plaintiff’s loss during this period, he was able to determine from his work-papers plaintiff’s overhead costs which amounted to $44,-594.04 and, since plaintiff was engaged principally on the tow target contract during this period, he was of the opinion that substantially all of such costs were allocable to that contract. Included in such costs were estimated amounts for certain expense items totaling $29,850 of which the major item was officers’ salaries of $25,000.
(e) Regarding the period subsequent to May 1, 1955, (finding 34(a) (3)), Mr. Simon testified that the overhead costs reflected in the analysis were in part based on a review of some of plaintiff’s canceled checks which were made avail *779 able to him about a week prior to the trial; and that the analysis also contained estimates of certain overhead expense items including officers’ salaries which were based upon the amounts of such salaries paid in prior years. Mr. Simon stated that since the only work performed by plaintiff during this period was on the tow target contract, the entire overhead amount of $72,343.57 was allocable to that contract.
(f) It is to be noted that the analysis of overhead for the period beginning November 1, 1954, and ending April 30, 1955, and for the period subsequent to May 1, 1955, makes no deductions for amounts withdrawn for overhead costs from the special bank account. As set forth in finding 31 (b) during the period beginning August 26, 1955, and ending August 15, 1956, plaintiff made withdrawals from the special bank account in the amount of $46,007.76, including withdrawals for overhead costs. Since the withdrawals were to reimburse plaintiff for costs already incurred, it is probable that some of the withdrawals were for overhead costs incurred during the period beginning November 1,1954, and ending April 30, 1955 (finding 34(a)(2)). Some of the withdrawals from the special bank account were for overhead costs incurred during the period subsequent to May 1, 1955 (finding 34(a) (3)).
35. Since plaintiff’s records were no longer in existence an audit could not have been made to verify the accuracy of the recomputation of plaintiff’s claim for the period ending October 31, 1954, or of the analysis of plaintiff’s overhead for the two succeeding periods. The record does reflect, however, that audits or attempts to audit plaintiff’s records were made by the Navy at certain intervals during the contract period. These were as follows:
(a) An audit was conducted by the Navy of plaintiff’s records sometime during 1954. The testimony of Mr. Simon indicates that figures resulting from tins audit were at substantial variance from the figures reflected in plaintiff’s recomputation for the period ending October 31,1954, particularly as to the allocation of overhead (finding 34(a) (1)). This audit is not in evidence, but it is reasonable to conclude that the Navy Contract Adjustment Board had the audit available for consideration when,the Board reached its con- *780 elusion on November 16, 1954, that an amendment without consideration to plaintiff’s contract in the total sum of $36,000 was warranted (finding 22, supra).
(b) The Navy attempted to conduct audits of plaintiff’s records in November 1955, and again in late 1956 or in early 1957, but because of the inadequacy of plaintiff’s records the accuracy of the overhead reflected in plaintiff’s analysis of overhead for the period beginning November 1, 1954, and ending April 30, 1955, (finding 34(a) (2)) and for the period subsequent to May 1, 1955, (finding 34(a)(3)) was not contemporaneously verified.
Ultimate Findings ON Tow Target CoNtract
36. (a) Although the delays which occurred prior to plaintiff’s acceptance on March 28,1955, of the finding of the Navy Contract Adjustment Board were caused principally by the defendant, the delays were in part caused by production deficiencies attributable to plaintiff.
(b) The evidence does not establish that plaintiff’s acceptance of the Board’s finding was induced by duress or coercion or by malfeasance on the part of defendant’s representatives.
37. During the period after plaintiff’s acceptance of the Board’s finding and until August 19,1955, when Modification No. 3 and the agreement for the special bank account were executed the delay was caused by plaintiff’s assignment of moneys due under the contract to the Internal Bevenue Service and the necessity of the Contracting Officer to obtain a waiver of the assignment and tax lien before effectuating the finding of the Board.
38. The evidence does not establish either (a) that the delay during the period after the execution on August 19,1955, of Modification No. 3 and the agreement for the special bank account was the fault of defendant, or (b) the amount of the loss sustained by plaintiff attributable to the delay.
SLEEPING BAG CONTRACT
39. (a) On November 21, 1951, defendant, through the New York Quartermaster Procurement Agency, U.S. Army, issued an invitation for bids for the furnishing of 58,000 *781 mountain sleeping bags in accordance witli certain conditions and specifications.
(b) In response to the foregoing invitation plaintiff, under date of December 20, 1951, submitted its bid to defendant for the furnishing of the sleeping bags at an aggregate price of $1,198,570.
(c) Under date of January 17, 1952, plaintiff was notified that its bid was accepted and that it was awarded contract No. DA 30-280-QM-23627.
40. (a) The original contract provided for shipment to be made f.o.b., Bayonne, New Jersey, and that the tentative destinations of the sleeping bags would be Schenectady, New York, and Auburn, Washington.
(b) Among the provisions of the contract were the following :
12. DISPUTES
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall be final and conclusive: Provided, That if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision.of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer’s decision.
* * * * *
25. NAMES AND LOCATION OF FACTOKIES
The names and locations of the factories where manufacture of the items bid upon will be performed are set forth herein. The performing of any of the work contracted for in any place other than that named herein is prohibited, unless the same is specifically approved in advance by the Contracting Officer. If the Contracting Officer approves the use of any additional plant or f ac- *782 tory by the Contractor in the performance of the work herennder, extra costs to the Government (including extra costs in the transportation of property furnished by the Government for fabrication hereunder, as a result thereof) will be charged to the Contractor. Full responsibility for the fulfillment of the contract will remain with the Contractor.
The only name and location of the factory set forth in the contract was that of plaintiff’s plant in Bayonne, New Jersey.
41. (a) The body of a letter dated March 7, 1952, addressed to the New York Quartermaster Procurement Agency, from plaintiff reads:
We have gained the impression that approximately 50% or 29,000 Bags, Sleeping, Mountain on the above contract are to be delivered to Auburn, Washington.
May we request your permission to have the portion of bags — more or less than 29,000 as best suits the interest of the Government — filled at the plant of the Reed Feather Co. in Los Angeles, California ?
As you know, Reed is to furnish 40/60 mixture for 29,000 bags and it would reflect a considerable saving to the Government to have the F.O.B. point of the bags for Auburn, Washington, at Los Angeles.
Mr. Reed is in complete agreement and a copy of our arrangements will be mailed you at once.
(b) By letter dated May 6, 1952, addressed to the New York Quartermaster Procurement Agency, the Reed Feather Company requested that it be allowed to start by July 1,1952, the filling and shipping of whatever sleeping bags were destined for the west coast.
(c) The body of a letter dated May 26, 1952, addressed to plaintiff from the Contracting Officer reads:
Reference is made to Contract No. QM 23627, OI8941 and previous correspondence relative to your request to perform filling and closing operation at the plant of the Reed Feather Company, Los Angeles for that quantity of subject contract scheduled for shipment to West Coast destinations.
Information currently available to this office indicates that deliveries to West Coast destinations are scheduled to commence July 1952. Shipping documents will be issued to effect this change in f.o.b. point for deliveries scheduled to a West Coast consignee. These documents will be furnished in sufficient time to enable the Reed *783 Feather Company to conform to contractual delivery requirements.
42. (a) Under date of June 20,1952, the Contracting Officer issued Modification “1” which provided in part:
Contract is hereby amended to provide for
SUBCONTRACTING by — Reed Feather Co., 1917 Bay St., Los Angeles, Calif, who will perform the filling closing and shipping operations for 28,048 Bags, Sleeping, Mountain, scheduled for shipment to West Coast destinations, beginning July 1952 through December 1952. No additional cost to Government.
Reason: Request of contractor in order to facilitate delivery.
(b) The body of a letter addressed to the Commanding General, New York Quartermaster Procurement Agency, from plaintiff reads:
In connection with the above contract and modification No. 1 we would like all remaining Bags, Clothing, Waterproof to be furnished by the government shipped directly to Reed Feather Company, 1917 Bay Street, Los Angeles, California.
We note that most of the Bags, Clothing, Waterproof are being shipped into New York from the Utah General Depot. It would seem, therefore, that shipment to Los Angeles would entail no additional cost to the Government.
Thank you for your prompt attention.
43. (a) In early October 1952 a dispute which had arisen between plaintiff and Reed Feather Company resulted in cancellation of Reed Feather Company’s subcontract with plaintiff.
(b) By letter dated October 20,1952, plaintiff advised the Contracting Officer that plaintiff had reached agreements with the National Feather & Down Company and with the Sanitary Feather & Down Company for the filling by each company of 14,024 sleeping bags.
(c) In a responding letter dated October 21, 1952, the Contracting Officer advised plaintiff that his office would require signed copies of plaintiff’s agreements with the National Feather & Down Company and with the Sanitary Feather & Down Company; and that “in the event the proposed subcontractual arrangement is approved by this office, *784 any and all increased costs to the Government resulting therefrom, shall be borne by you [plaintiff].”
(d) The body of a letter dated October 30, 1952, to the Contracting Officer from plaintiff reads:
In connection with the requested change of sub-contractor from the Eeed Feather Company of Los Angeles, Cal. to a combination of National Feather & Down Company and Sanitary Feather Company, both of Brooklyn, there seems to be some question as to additional costs which may accrue to the Government.
We wish to express our willingness to bear any extra costs that may be incurred by reason of the change of F.O.B. point.
However we respectfully request the Government to bear in mind that the original competitive bid was evaluated on the basis of Bayonne, N.J. as the shipping point.
With this in mind, it is our opinion that no additional costs will be incurred.
(e) By letter dated November 21, 1952, to plaintiff, the Contracting Officer granted permission to plaintiff to utilize the plant and facilities of the National Feather & Down Company and the Sanitary Feather & Down Company, both of Brooklyn, New York, for filling, packing, and shipping unfilled sleeping bag casings to be supplied by plaintiff, “provided that you [plaintiff] bear any and all increased costs including transportation costs, resulting by reason of the change in shipping point from FOB Los Angeles, California to FOB Brooklyn, New York.”
(f) Under date of January 27, 1953, the Successor Contracting Officer issued Modification “6” which provided in part:
Contract is hereby amended to provide for subcontracting as follows:
7,000 each Bag, Sleeping, Mountain,] Sanitary Feather & Regular -1 Down Go., 409 Wil-
7,024 each Bag, Sleeping, Mountain, [ loughby Avenue, Large-J Brooklyn, N.X.
7,000 each Bag, Sleeping, Mountain,] National Feather & Regular-1 Down Co., 160-166
7,024 each Bag, Sleeping, Mountain, | 7th Street, Brooklyn, Large-J N.X.
These subcontractors will perform the closing, filling and shipping operation at no additional cost to the Government.
*785 This subcontracting is permitted only on condition that any and all increased costs to the Government as a result of change in F.O.B. point from Los Angeles, California, to Brooklyn, New York, shall be borne by the prime contractor.
44. (a) The body of a letter dated April 27, 1953, to defendant from plaintiff reads:
Be: Contract DA-30-280-QM 23627 01-8941 Bag, Sleeping, Mtn.
Gentlemen:
Your attention is directed to recent remittances against above contract.
Starting on December 16, 1952 a withholding of $.65 per bag was begun. This has accumulated to an amount in excess of $15,000.00 at the present writing.
The amount being deducted is to cover the possible freight differential for the change in F.O.B. point from Los Angeles, Calif., to Bayonne, New Jersey for approximately 28,000 bags, sleeping, mountain.
In our letter of October 30, 1952, we pointed out the urgency of replacing the Beed Feather Company of Los Angeles, California with two local feather processors in Brooklyn, N.Y. The reason for this request was the very obvious desire on the part of Beed to avoid his previous commitments made both to us and the Armed Services Textile & Apparel Procurement Agency. Their efforts are well known by your agency.
We called attention, in that letter to the fact that the above mentioned contract was evaluated and awarded to us on the basis of Bayonne, New Jersey as the point where shipments would originate.
In an effort to expedite shipments we entertained, in good faith, a proposal by Beed Feather to fill and pack that portion of the contract that was to be delivered to a West Coast destination.
Upon presentation of Beed’s proposition to the Armed Services Textile & Apparel Procurement Agency, we suggested that a freight saving would undoubtedly result.
On June 20, 1952 Modification 1 was issued giving us permission to subcontract the portion of work described therein, to Beed. Shortly thereafter they abrogated their contract with us.
The entire Beed transaction cost us many thousands of dollars. This included freight paid for 2,000 bags sent from Bayonne to Los Angeles and the return to Bayonne of the same 2,000 bags plus some 17,000 or 18,000 *786 Bags, Clothing, Waterproof which were Government Furnished Properties. Our actual outlay for freight alone was $3100.00.
It is a plain fact that the change in F.O.B. point did not add one cent to the $1,198,570.00 face value of the original contract.
This request is for a modification to repeal Modification Number 1 and return the original contract conditions.
Please make every effort to expedite action on this request as the $.65 reduction is working an extra hardship on us after all the aforementioned difficulties.
Reimbursement of all of the withheld funds is urgently requested.
(b) A responding letter dated May 18, 1953, from the Successor Contracting Officer reads in part:
You seem to have overlooked completely Modification No. 6 dated 27 January 1953 which permitted subcontracting to the Sanitary Feather & Down Co. and the National Feather & Down Co., both of Brooklyn, N.Y., “only on condition that any and all increased costs to the Government as a result of change in F.O.B. point from Los Angeles, California, to Brooklyn, New York, shall be borne by the prime contractor”.
This condition was not imposed arbitrarily. The basis for it was the fact that by Modification No. 1 the Government acquired a vested right to the lower freight rates from Los Angeles, California, to the destination. A Contracting Officer has no authority to waive a vested right of the Government without consideration. Therefore, this condition was imposed in Modification No. 6 and it cannot be deleted now.
The withholding of $.65 per bag was to cover the estimated increased costs. Now that the contract has been completed these increased costs are being computed exactly and the proper adjustment will be made shortly.
45. Under date of December 11, 1953, the Successor Contracting Officer sent to plaintiff Findings of Fact in which were recited the substance of the events relating to the sleeping bag contract, and which then continued as follows:
The Contracting Officer hereby makes the following Findings of Fact pursuant to Article 12 of the General Provisions entitled “Disputes” which is contained in the subject contract:
a. That the amount of excess transportation costs incurred by the Government because of the change in *787 F.O.B. point from Los Angeles, California to Brooklyn, New York was $14,702.05.'
The letter concluded by advising plaintiff that it might appeal to the Secretary of the Army under the “Disputes” clause in the contract and that such appeal would be heard by a Board as the duly appointed representative of the Secretary.
46. (a) By letter dated December 29, 1953, plaintiff appealed to the Secretary of the Army from the decision of the Successor Contracting Officer. In its letter plaintiff stated in part:
The decision with its resultant effect, was erroneous. The contractor contends that under the provisions of the subject contract, including the modifications thereto, there were no excess transportation costs incurred by the Government which were chargeable to the contractor, and that there were no transportation costs incurred by the Government in excess of the costs of the transportation originally contemplated by the Government at the time the contract was awarded, F.O.B. Bayonne, New Jersey; and that any excess transportation costs incurred as. a result of the modification of the contract, and the failure to perform by the subcontractor which required a further modification of the contract, have been borne and have been already paid for by the contractor. Therefore, no justification for the withholding of the $14,702.05 by the government exists and that such amount should be paid to the contractor without further delay.
This appeal is taken pursuant to the provisions of the contract, Article No. 12, entitled “Disputes.”
(b) On October 21, 1954, a hearing on plaintiff’s appeal was held in Washington, D.C., by the Armed Services Board of Contract Appeals, at which plaintiff’s vice president, Mr. Chase, testified.
(c) Under date of November 29, 1954, the Board issued its opinion which reads in part:
DECISION
The contractor has endeavored to show that it is unfair of the Government to assert its claim for the excess transportation costs. This Board has said on many occasions that it cannot grant equitable relief not pro *788 vided for in the contract. The Board must enforce the contract as made by the parties.
The “Changes” article of the contract permits the contracting officer to change the “place of delivery.” The failure to agree to any adjustment is stated in that article to be a dispute under the “Disputes” article. The latter article requires an appeal to be taken within 30 days from the date of receipt of the contracting officer’s decision or his decision shall be final and conclusive.
In Modification “1” the contracting officer specifically provided that the change in the place of delivery was made at “No additional cost to the Government.” The contractor did not object to that provision. In fact, it requested the change to be made and at no time even as much as suggested that it be given a price increase. It is true that the Government would have saved on freight if any shipments had been made to Auburn, Washington, from Los Angeles, California, rather than from Bayonne, New Jersey. The Government argues that under the original contract it only contemplated making shipments to eastern destinations and could have awarded a new contract to a western contractor for the shipments to Auburn but only authorized the change because of the contractor’s request. The Government also pointed out that the contractor was probably obligated under its original arrangement with the Need Feather Company to pay the cost of transporting the feather and down mixture from Los Angeles to Bayonne, which would have been saved to the contractor by the filling and delivering of the bags at Los Angeles.
After the issuance of Modification “1”, the delivery point of the contract with regard to the 28,048 bags covered therein was f.o.b. Los Angeles. The Government had the legal right to expect and insist on such delivery. The parties were then free to negotiate as to any change in that point. The contracting officer stated in Modification “6” that he would only authorize a change in that point if “all increased costs to the Government as a result of change in F.O.B. point from Los Angeles, California, to Brooklyn, New York, sbq.11 be borne by the prime contractor.” The contractor did not protest such condition but made subcontracts which required a change in the delivery point.
The Board has no alternative but to find that under the contractual instruments the contractor is obligated to pay the excess transportation costs assessed.
The appeal is denied.
*789 . 47. (a) It was stipulated by the parties that the shipping costs involved in shipping the items in- question from the plants of National Feather & Down Company and Sanitary Feather & Down Company in Brooklyn, New York, to the destination (Auburn, Washington) were identical with the shipping costs for shipping the same items from plaintiff’s plant in Bayonne, New Jersey, to the same destination.
(b) There was deducted by defendant from moneys otherwise due plaintiff under the sleeping bag contract the sum of $14,702 representing the extra shipping costs incurred as a result of the change of the f .o.b. point from Los Angeles, California, to Brooklyn, New York.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover. The petition is, therefore, dismissed.

 The court has adopted the Trial Commissioner’s findings as its findings. Included therein are the facts of plaintiff’s discontinued counts.

 The Findings of Fact do not reflect which of the two parties, Reed Feather or plaintiff, cancelled the subcontract. The point is, however, not relevant to the case at hand.

 The condition referred to allowed the Brooklyn subcontracting only on the ground that plaintiff pay Increased costs which resulted from the change in F.O.B. point from Los Angeles to Brooklyn.

 A clarifying specification relating to the positioning of the reinforcement had been issued prior to the award of the instant contract but was unknown to the Navy personnel concerned with the contract.