**MICRECORD CORPORATION**
v.
**The UNITED STATES.**
No. 245–59.

United States Court of Claims.
June 10, 1966.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, and COLLINS, Judges.

## OPINION

COWEN, Chief Judge.

Plaintiff, an Illinois corporation engaged in the microfilming business, seeks to recover certain sums alleged to have been lost in performing a contract for the microfilming of obsolete engineering documents for the Air Force.

On September 17, 1954, the Wright Air Development Center, Wright-Patterson Air Force Base, Ohio, sent letters to a number of commercial microfilming companies, including plaintiff, requesting the submission of non-obligating estimates for the microfilming of some 750,000 old engineering drawings of various sizes. To assist prospective bidders in the preparation of such estimates the letter contained a chart which indicated that the "approximate" percentage of drawings of each size to the total number of drawings would be as follows:

| | | | |
|---|---|---|---|
| A—Size | (8½″ × 11″) | 40% |
| B—Size | (11″ × 17″) | 20% |
| C—Size | (17″ × 22″) | 15% |
| D—Size | (22″ × 34″) | 15% |
| R—Roll Size | (36″ or 42″ × ?) | 10% |

On October 4, 1954, in response to an invitation from the Air Force, representatives from nine microfilming companies attended a precontract briefing conference held at the Wright Air Development Center. After being given a brochure containing a set of temporary specifications covering the anticipated project, the conferees were conducted on a tour of two staging areas where the 750,000 drawings were stored.

Approximately 300,000 of the drawings were located in Staging Area 1, placed in boxes which were stacked on top of one another against the walls of a room. The boxes were individually labeled as to the number and size of the drawings contained in each. In addition, a list compiled and distributed to each conferee detailed the names of the con-

Charles I. Calisoff, Chicago, Ill., for plaintiff; Alan V. Mitchell, Chicago, Ill., attorney of record; Mitchell & Allen and Canel & Canel, Chicago, Ill., of counsel.

Frances L. Nunn, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

tractors who had prepared the drawings, the total number of boxes in the staging area, and the number of drawings in each box. No data were available, however, as to the total number of drawings in each size category. Hence, there was no practicable way for the prospective bidders at the time to discover by personal observation or by the official data the exact ratio of drawings of each size to the total number of drawings.

The remaining 450,000 drawings were stored in Staging Area 2, where little had been accomplished in the way of cataloging. The drawings there had not been counted or segregated in boxes according to size. Roll size documents were bundled in groups of 20 or 30, while flat sizes were wrapped by lots in paper. No list was available giving the total number of drawings in Staging Area 2, but the conferees were permitted to glean such information as best they could by random personal observation—such as by removing wrappings and inspecting bundles.

Plaintiff's two representatives arrived at Wright in the afternoon of October 4, 1954, after the other conferees had concluded their briefing session and tour of the facilities. The two were then conducted on a brief tour of Staging Areas 1 and 2, were permitted to examine drawings there, and were given the same brochure of temporary specifications distributed to the other conferees. Subsequently, plaintiff was provided with a copy of the minutes of the morning briefing conference. The minutes disclosed the fact that the Air Force had arranged only about 400,000 of the 750,000 drawings according to size and had no intention of sorting the remainder.[1] Thus, at this point, plaintiff and the other conferees had a limited knowledge of the size and scope of the task confronting the eventual contractor on the project. They knew that the Air Force had roughly 750,000 documents to microfilm, that these were divided into five general

sizes, and that there were no accurate figures available listing the number of drawings to be found in each size category. In preparing their estimates, the prospective bidders had to use as guidelines the "approximate percentages" suggested in the September 17, 1954, solicitation and such information as they were able to gather by personal observation of the staging areas.

On October 22, 1954, plaintiff submitted a non-obligating estimate based upon the microfilming of 762,000 drawings, divided according to the suggested percentages. After receiving plaintiff's response and the estimates from the other interested companies, the Air Force officials secured authority to expend a total of $59,375 on the project. A firm request for bids, based upon this authorized sum, was then sent to the prospective bidders, on November 16, 1955, and in this request the following figures were given with respect to the percentage of drawings of each size:

| | | | | | |
|---|---|---|---|---|---|
| A—Size | ........ | (8½″ × 11″) | ....... | 46% |
| B—Size | ........ | (11″ × 17″) | ........ | 19% |
| C—Size | ........ | (17″ × 22″) | ........ | 11% |
| D—Size | ........ | (22″ × 34″) | ....... | 9% |
| Roll Size | .... | (36″ or 42″ × ?) | .... | 15% |

For some reason the word "approximate" was omitted from this request for proposals, although it had been included in the earlier solicitation.

It is substantially more expensive for a contractor to microfilm roll size drawings than to process drawings of any of the other four sizes. In taking a microfilm picture only one frame or exposure is required to photograph an entire drawing of sizes A–D. A roll size document, however, may vary in length from 3 to 40 feet, and consequently cannot be photographed on a single frame (which normally has a length limit of 48 inches). Thus, it is apparent that more than one frame is required to accommodate most roll size drawings. Moreover, the rolls are unwieldy. Unlike the smaller size

---

1. At the conference, defendant's personnel had informed the conferees that the task of sorting and arranging the remaining drawings would be left to the job contractor.

units, which can be easily photographed on a flat surface, two men are needed to unwind and prepare the roll size drawings for filming. As a result, substantially fewer roll size drawings can be processed in a work day than flat drawings. Therefore, the more roll size documents a contractor has to process, the greater his expenditure will be as to both time and labor on the contract.

Plaintiff submitted a bid on December 16, 1955, providing for the microfilming and mounting on aperture cards of approximately 475,000 frames at a total price of $67,402.50 (using an average price of 7.25 cents per frame for filming and 6.94 cents for mounting). In the course of preparing the bid plaintiff did not request or make any additional examination of the subject drawings, although it did make reference to the fact that the word "approximate" had not been used in defendant's request for firm bids. Plaintiff was the successful bidder, and on May 9, 1956, executed a negotiated contract under which plaintiff agreed to process a total of 418,400 microfilm frames at a price of $59,370.96.

The controversy in the case arises from the fact that plaintiff, in performing the contract, microfilmed and mounted more roll size drawings than it had anticipated in preparing its bid. The cause of action is predicated upon the contention that defendant breached the contract by providing prospective bidders with deceptive and misleading specifications which greatly understated the percentage of roll size drawings to be filmed. In particular, plaintiff claims: (1) that the percentages set forth in the request for bids constituted an unambiguous representation by defendant and a definitive contractual provision as to the precise number of drawings in each size category; (2) that plaintiff relied completely on defendant's inaccurate figures in preparing its bid and was thereafter compelled to its detriment to process a significantly larger number of expensive roll size drawings than was required of it by the contract; (3) that this error on defendant's part constituted a breach

of the contract, and (4) that the breach caused plaintiff to sustain a substantial unanticipated loss on the project.

Our trial commissioner found that the evidence presented by plaintiff is not sufficient to show that any costs it incurred in excess of the contract price was caused by a greater proportion of roll size drawings than was stipulated in the contract. He also found that plaintiff did not prove that there was any misrepresentation by defendant which caused an increase in plaintiff's costs of performance. Since plaintiff has failed to overcome the presumption of correctness which attaches to the commissioner's findings under our Rule 66, we have adopted his findings. Davis et al. v. United States, 164 Ct.Cl. 612 (1964) and Dodge Street Building Corp. v. United States, 341 F.2d 641, 169 Ct.Cl. 496, (1965). The language of the contract and the course of conduct between the parties fail to reveal such a misrepresentation or mistake on defendant's part as would amount to a breach of the contract. Moreover, it is clear from the evidence: (a) that plaintiff could not reasonably have been misled by any statement of defendant, and (b) that the major causes of plaintiff's unexpectedly high costs and attendant loss on the project—a serious error in the preparation of its bid, a delay in the delivery of aperture cards by a subcontractor, and deficiencies in plaintiff's accounting system—cannot be attributed to any action on defendant's part. In short, plaintiff has failed to establish the essential elements of either liability or damages.

Plaintiff's breach of contract argument, as noted above, rests upon the unproved assertion that the percentages set forth in defendant's request for proposals constituted a clear and unequivocal contractual representation as to the exact number of drawings of each size category contained in the two staging areas at Wright Air Development Center. Plaintiff maintains that bidders could have expected to rely with confidence upon the accuracy of these official figures in preparing their bids, and that the con-

tract, as eventually executed, incorporated these statistics by reference and set definite limits on the scope of the work to be done by the contractor. The record, however, establishes that defendant at various times and in various ways suggested to plaintiff and the other prospective bidders that the figures submitted were but estimates. The October 4, 1954, briefing conference and tour of the staging areas should have thoroughly convinced any prospective bidder that the relevant drawings had not been adequately counted or assorted, and were in a state of considerable disarray. In addition, the Air Force clearly informed the bidders at the briefing conference (the minutes of which were received by plaintiff) that it would not further arrange or classify the approximately 750,000 documents on hand. A prudent bidder could only have concluded from personal observation and from the consistent statements of defendant's personnel that the figures announced in the request for proposals were intended to be merely guidelines and not an accurate reflection of the division of drawings into size categories. In fact, it cannot be said that defendant itself knew with certainty even the total number of drawings stored in its facilities. Hence, any prospective bidder should have anticipated (and taken into consideration as a natural risk of contract performance in preparing its bid) that there would undoubtedly be some variation between the actual breakdown of the types and number of drawings and the estimate submitted by defendant. The record also shows that plaintiff was afforded some degree of latitude in selecting which drawings it desired to process and that it had the opportunity on its own behalf of reducing the percentage of roll size drawings processed under the contract.

■■ The primary objective of contractual interpretation is to ascertain and give effect to the mutual intention of the contracting parties, and to this end a contract should be appraised as a whole—giving just consideration to the fundamental purposes of the parties and the surrounding factual circumstances at the time of execution. Certainly, the agreement in issue should not be construed in such a manner as to contradict the reasonable, mutual, and manifested understanding of the signatories, such as by giving undue significance to a careless recital contained therein or by divorcing the language employed from the relevant factual environment. Russell & Pugh Lumber Co. v. United States, 290 F.2d 938, 154 Ct.Cl. 122 (1961); Choctaw Nation v. United States, 91 Ct.Cl. 320, 369–370 (1940), cert. denied, 312 U.S. 695, 61 S.Ct. 730, 85 L.Ed. 1130 (1941). See also Jansen v. United States, 344 F.2d 363, 170 Ct.Cl. 346 (1965) and Jones & Sears, Inc. v. United States, 158 Ct.Cl. 162 (1962).

■■ In the situation at hand, the failure to include the qualifying word "approximate" in the description of the figures set forth in the request for proposals (after it had been included in the earlier request for estimates) was undoubtedly an inadvertent omission on defendant's part. Plaintiff's attempt to attach critical importance to this error is unjustified, for it necessitates an overly literal interpretation of the language of the request for proposals—an interpretation which would in effect ignore the essential realities of the bargain made by the parties. Russell & Pugh Lumber Co. v. United States, supra; Chase & Rice, Inc. v. United States, 354 F.2d 318, 173 Ct.Cl. —— (December 1965); Jones & Sears, Inc. v. United States, supra. In view of the nature of the contract, the state of the subject matter, and the surrounding circumstances known to the parties at the time the contract was executed, it must be inferred that the figures listed in the request for proposals could only have been regarded as estimates, and not a definitive representation as to the division of the drawings at Wright.

■ The evidence, moreover, does not establish that plaintiff was in fact misled by the accused contract language. Under the contract, plaintiff agreed to process a total of 418,400 microfilm frames,

drawing from a supply of roughly three-quarter million documents, and plaintiff knew that the documents had been only partly assorted according to size. If plaintiff had any misgivings about the exact scope of the task confronting it or the significance of the percentages published by the Air Force, it made no serious effort to resolve its doubts by discussing the matter with defendant's representatives until the contract work had been virtually completed. Plaintiff does not seem to have acted as if it were particularly troubled by the condition of the drawings during performance and did not make a formal complaint along the lines now urged until the work had actually been completed. Its conduct, in fact, bespeaks an understanding and acceptance of the Government's position. Although no statement to the effect that the suggested percentages were only estimates was specifically incorporated in the request for proposals or the contract itself, it is clear that such was the manifest intention of the Government and the only reasonable conclusion that could have been drawn by the contractor. Plaintiff received what it bargained for under the contract and has no cause to complain now that it did not fully appreciate the scope or risk of the undertaking to which it committed itself. Russell & Pugh Lumber Co. v. United States, supra; Allied Contractors, Inc. v. United States, 310 F.2d 945, 159 Ct.Cl. 548 (1962).

We have adopted the trial commissioner's finding that 69,458 roll size drawings were actually filmed by plaintiff during the course of contract performance (or about 21.5 percent of a total of 323,919). It thus processed about 6.5 percent more roll size documents than indicated by the 15 percent figure in the request for proposals. Considering the fact that defendant's percentages were but estimates and that plaintiff must be regarded as having known the general condition of the drawings, the 6.5 percent variation was a reasonable one under the circumstances and

within the scope of the risk assumed by plaintiff.

Plaintiff has also failed to show that it suffered any damages as a consequence of defendant's action. It claims to have expended some $96,607.04 on the contract, yet the only admissible evidence offered at trial shows that a total of only $71,864.09 was spent on the project. Although the processing of a greater number of roll size drawings would inevitably have entailed an increase in plaintiff's costs, it has not furnished the court with a reasonable approximation of what these costs might have been. It has not segregated its actionable costs (those sustained because of defendant's alleged mistake or misrepresentation) from the expenses it incurred as a result of purely extraneous factors. This failure must be regarded as a fatal impediment to its proof of damages, for there is an affirmative showing in the record that other causes, for which defendant was in no way responsible, contributed materially to plaintiff's financial difficulties. Wunderlich Contracting Co. v. United States, 351 F.2d 956, 173 Ct.Cl. —— (October 1965); Commerce International Co. v. United States, 338 F.2d 81, 167 Ct.Cl. 529 (1964); J. D. Hedin Constr. Co. v. United States, 347 F.2d 235, 171 Ct.Cl. —— (June 1965).

Much of the unexpected loss which plaintiff sustained can be traced to a substantial error in the preparation of its bid. The contract called for the processing of 418,400 microfilm *frames*, while the request for proposals suggested the approximate percentage of *drawings* of each size contained in the staging areas. The number of drawings which would have to be filmed in order to produce a total of 418,400 frames was not specified because this figure would vary according to the number of roll size drawings processed (taking into consideration the fact that more than one frame is required to film roll size documents). Therefore, it should have been apparent to any bidder that the number of drawings to be used in the contract work would have to be considerably less than 418,400.

Plaintiff, in preparing its bid, confused the terms *frames* and *drawings* and thereby arrived at a set of erroneous computations. Its crucial error consisted of applying the percentages supplied by defendant of the various *drawing* sizes to 418,400 (the total number of *frames* called for) in order to determine its anticipated costs. By so doing, it seriously underestimated the number of roll size drawings that it would have to process in order to produce a total of 418,400 frames. The following tables indicate the source of plaintiff's difficulty. The first schedule shows how plaintiff should have prepared its bid, following defendant's percentages and using plaintiff's own estimate that an average of 2⅓ frames would be required to film each roll size document:[2]

| Drawing size | Drawings | | Frames | |
| --- | --- | --- | --- | --- |
| | Percentage | Quantity | Percentage | Quantity |
| A .................................. | 46 | 160,387 | 38.33 | 160,387 |
| B .................................. | 19 | 66,247 | 15.83 | 66,247 |
| C .................................. | 11 | 38,353 | 9.17 | 38,353 |
| D .................................. | 9 | 31,380 | 7.50 | 31,380 |
| Roll .................................. | 15 | 52,300 | 29.17 | 122,033 (53,300 x 2⅓) |
| | 100 | 348,667 | 100 | 418,400 |

Plaintiff, according to the petition, actually computed its offer as follows:

| Drawing size | Drawings | | Frames | |
| --- | --- | --- | --- | --- |
| | Percentage | Quantity | Percentage | Quantity |
| A .................................. | .............. | .............. | 46 | 192,464 |
| B .................................. | (?) | (?) | 19 | 79,496 |
| C .................................. | .............. | .............. | 11 | 46,024 |
| D .................................. | .............. | .............. | 9 | 37,656 |
| Roll .................................. | .............. | .............. | 15 | 62,760 |
| | | | 100 | 418,400 |

As can be seen, plaintiff's computation failed to take into account the vital fact that roll size drawings require more than one frame to film. Defendant's suggested percentages had no direct relevance to the number of frames called for under the contract—they merely indicated the approximate division of the drawings in the staging areas by size. By its basic accounting error of applying the *drawings* percentages to the number of *frames,* plaintiff underestimated the number of roll size drawings needed by about one-half (62,760 rather than 122,033). That mistake resulted in a substantial underbid, for the reason that roll

2. Actual contract experience shows that plaintiff used an average of 2.48 frames per roll size drawing.

size drawings are concededly more expensive to process than the other, smaller documents.[3]

Plaintiff's costs were also unexpectedly increased through the action of one of its subcontractors. During the course of performance plaintiff experienced substantial difficulty in obtaining delivery of the aperture cards upon which the individual microfilm frames were to be mounted. An order had been placed with the Filmsort Company in July of 1956, and plaintiff was led to believe that only one month would be needed for the manufacture of the cards. Delivery was not made, however, until at least the very end of 1956 or the beginning of 1957. Apparently the delays in shipment were caused by Filmsort's insistence that plaintiff pay for shipments in advance of delivery. By plaintiff's own admission, this delay in the receipt of aperture cards increased its costs considerably. Defendant is not responsible for the unfortunate effects of plaintiff's financial arrangements with the supplier.

Another cost-increasing factor is found in plaintiff's ancillary claim that it sustained damages in the amount of $3,647.28 as a result of allegedly having been compelled to film an overrun of 8,736 roll size drawings. The evidence shows that plaintiff did in fact produce an overrun of 8,736 *frames* (427,136 rather than 418,400), but there is no way of ascertaining how many of the frames involved were processed from roll size drawings. Plaintiff contends that it was given more drawings by defendant to film than it was required to accept under the contract, but it did not prove that defendant required it to process the additional frames, or that it was under any obligation to do so. Plaintiff did not at the time make any protest to defendant's representatives, nor did it attempt to stop production as soon as it had completed the 418,400 frames specified in the contract. Since plaintiff's records were not kept in such a manner as to enable it to know how many frames or drawings had been completed at a given time, it appears quite likely that the 8,736 extra frames had already been processed before plaintiff actually became aware of the overrun. This overproduction, for which defendant is not accountable, must also have had the effect of increasing plaintiff's costs.

3. The petition lists the following per frame figures for filming and mounting drawings of each size (cost plus profit) in order to show how plaintiff computed its offer of $59,370.96: A Size—8¢; B Size—9¢; C Size—12¢; D Size—13.5¢; Roll Size—41.75¢. See finding 12. Applying plaintiff's own estimated per frame figures to the quantity of frames for each drawing size classification that it should have expected if its bid were computed reasonably, its total bid price would have been computed as follows:

| Drawing size | Cost per frame | Number of frames | Total cost |
|---|---|---|---|
| A | $0.08 | 160,387 | $12,830.96 |
| B | .09 | 66,247 | 5,962.23 |
| C | .12 | 38,353 | 4,602.36 |
| D | .135 | 31,380 | 4,236.30 |
| Roll | .4175 | 122,033 | 50,948.78 |
| | | 418,400 | $78,580.63 |

The above figures, which are derived from those used in the petition and which we use for the sole purpose of demonstrating the nature of plaintiff's computation error, reveal that plaintiff's offer of $59,370.96 for 418,400 frames was erroneously low.

On August 27, 1957, plaintiff wrote to the contracting officer requesting information relative to renegotiation of the contract "for reasons of excessive costs beyond our control." The desired relief was denied, and on August 23, 1958, plaintiff presented a claim to the General Accounting Office on the basis of the alleged misrepresentation in the request for proposals—contending that the number of roll size drawings actually filmed on the job amounted to 62.6 percent of the total, and asserting that the resulting extra costs amounted to $14,-561.41. The General Accounting Office disallowed the claim, stating that only 21.6 percent of the drawings filmed could be shown to have been of roll size and that this percentage was reasonably in accordance with the estimates furnished by defendant. The decision also stated that plaintiff had been given the opportunity of limiting its contract costs by selecting job lots containing a larger proportion of flat drawings than roll size drawings, but that plaintiff's representatives had not taken full advantage of this privilege.

In summary, then, plaintiff has failed to establish liability on defendant's part, either for misrepresenting the actual state of the drawings or for compelling plaintiff to film more documents than was specifically agreed to in the contract. Moreover, plaintiff has not shown that it relied on defendant's alleged misrepresentation or that defendant's action caused it to sustain any loss. To the contrary, it appears that most or all of plaintiff's unanticipated costs were caused by its own shortcomings. The petition is therefore dismissed.

On May 10, 1963, the court entered judgment in the amount of $3,577.21, plus interest, for defendant on its counterclaim based upon a loan to plaintiff by the Small Business Administration. This amount has not yet been paid by plaintiff.