**INTERNATIONAL GRAPHICS, DIVISION OF MOORE BUSINESS FORMS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 586–83C.

United States Claims Court.

April 18, 1984.

Robert D. Wallick, Washington, D.C., for plaintiff; Steptoe & Johnson, Washington, D.C., of counsel.

Stephen R. Bergenholtz, Washington, D.C., with whom was Acting Asst. Atty. Gen., Richard K. Willard, Washington, D.C., for defendant.

## ON PLAINTIFF'S MOTIONS IN LIMINE

REGINALD W. GIBSON, Judge:

This matter comes before the court on plaintiff's first and second "Motion *In Limine*," filed February 29 and March 2, 1984. Said motions, and defendant's response thereto, come as the latest skirmish in a long series of procedural battles, pertaining to the cancellation of a solicitation (Program 114–S) by the Government Printing Office (GPO) for the printing and distribution of the Commerce Business Daily (CBD).[1] Plaintiff's first motion seeks the exclusion from evidence in the forthcoming trial on the merits of a series of proposed exhibits filed by defendant and related testimony, which purport to estimate the in-house costs of performing the requirements of Program 114–S under the standards of Office of Management and Budget (OMB) Circular A–76 (A–76).[2] In its first motion, plaintiff contends that defendant's estimates and re-estimates in the exhibits it challenges constitute an *ex post facto* attempt to justify cancellation of its solicitation which contradict both A–76 and the general principles of fairness in government procurement. Plaintiff's second motion seeks the exclusion of all evidence (documentary and otherwise) directed at justifying the cancellation of the solicitation by utilizing the cost comparison standards of the August 4, 1983 amended ver-

---

1. For a previous history of this case, *see International Graphics v. United States,* 4 Cl.Ct. 186 (1983).

2. OMB Circular A–76 was originally issued in 1966, for the purpose of "establish[ing] the policies and procedures used to determine whether needed commercial or industrial type work should be done by contract with private sources or in-house using Government personnel." See OMB Circular No. A–76, 44 Fed.Reg. 20,556, 20,557 (1979). The Circular was revised by sev-

en Transmittal Memoranda (TM) between January 1967 and October 1982, most notably TM # 4 (1979), which incorporated a completely revised version of the main body of the Circular as well as a new detailed Cost Comparison Handbook. On January 12, 1983, OMB published another proposed revision of the Circular in the *Federal Register.* See 48 Fed.Reg. 1376 (1983). The proposed changes were then adopted and implemented as OMB Circular No. A–76 (Revised) on August 4, 1983.

sion of A–76. It contends instead that only the *1979* version of A–76 (as amended by Transmittal Memoranda between 1980 and 1982) provides valid standards for comparison between in-house costs and commercial bids.

The facts pertinent to plaintiff's present motions are set forth below. For the reasons stated hereinafter, this court must deny both of plaintiff's motions.

## FACTS

On February 24, 1982, the GPO issued a solicitation styled Program 114–S, which advised in its letter of transmittal to prospective bidders as follows:

> ... The Government Printing Office is doing a feasibility/cost analysis for the requirements of the "Commerce Business Daily." *This will be accomplished as outlined in OMB Circular No. A–76.* This solicitation is *in part for information and planning purposes and consequently,* it may be that the Government *will not award* a contract on the basis of this solicitation .... (Emphasis added.)

Subsequently, a pre-bid conference was held on Program 114–S on March 9, 1982, which was attended by prospective bidders, including plaintiff. The following bidder questions and GPO responses, pertinent to the issues herein, occurred:

> Q. Can you provide a copy of OMB Circular No. A–76 referred to in your letter of February 24, 1982?
>
> A. Yes.
>
> Q. Will provisions of A–76 be used as criteria for proposals?
>
> A. GPO is not bound by OMB A–76 *but adopts its theory in principal* [sic]. (Emphasis added.)

In the February 24, 1982 solicitation, the GPO stated that it intended to issue a Single Award Term Contract for the publication and distribution of the CBD for the Department of Commerce by the method known as Two-Step Formal Advertising. Under this method, bidders were first invited to submit technical proposals, without pricing. Those bidders that submitted acceptable technical proposals were then to be issued formal Invitations for Bids (IFBs), under which they were to submit final price bids.

The GPO did not complete its evaluation of technical proposals and issue its formal IFB under Step Two of the solicitation until August 15, 1983. The resulting IFB disclosed, *inter alia,* that bids must be submitted for all lots and for all items therein; however, defendant reserved the right to award "by lots or any combination thereof."

The lots upon which bids were required were delineated into four categories as follows:

| Lot | Description of Services Sought | Services Currently Performed by |
|---|---|---|
| 1 | Editorial | DOC [3] |
| 2 | Typesetting | Commercial Contractor |
| | ADP Capability | DOC |
| 3 | Printing/Binding | GPO |
| 4 | Subscription Management | SOD [3] |

Bids under the IFB were received from five commercial bidders, as well as the GPO itself, by September 16, 1983. Plaintiff submitted two bids, dated September 15, 1983. Its first bid was on all lots separately, and its alternate bid was for a total package price, pursuant to an option offered to bidders in a September 1983 amendment to the IFB. The GPO submitted in-house costs only on Lots 3 and 4, however, and utilized the low contractor price on Lots 1 and 2 for evaluation purposes. Bids were opened by the GPO's contracting officer on September 16, 1983. At this time, the bids of all bidders except plaintiff, defendant, and Jeffries Banknote Company were rejected as nonresponsive.[4]

Stemming from information and belief, plaintiff reasoned that the GPO imminently

---

**3.** DOC is the Department of Commerce. SOD is the Superintendent of Documents.

**4.** Jeffries Banknote Company intervened in this action on September 29, 1983 (allowed on October 4, 1983), and subsequently withdrew by motion on February 29, 1984.

contemplated awarding Lots 1 and 2 of the contract to Jeffries Banknote Company and Lots 3 and 4 to itself. (Jeffries and the GPO were the apparent low bidders on the respective lots.) Accordingly, in a letter dated September 20, 1983, plaintiff protested, anticipatorily, the award of a contract to anyone other than itself, and requested the administrative review/appeal mandated by OMB Circular A–76.[5] Whereas defendant did not honor plaintiff's request, plaintiff immediately applied for a temporary restraining order in this court on September 22, 1983, against the awarding of a contract to anyone other than itself. Because defendant stipulated that no award of a contract would be made until after a hearing on October 5, 1983, this application was denied as moot. Before the hearing could be held, however, defendant abruptly cancelled the solicitation on October 3, 1983. This was done because retention of the CBD production and distribution in-house, rather than outsourcing same, would allegedly effect a $1.2 million cost savings to the government over the five-year life of the contract.

Thereafter, plaintiff's motion for a preliminary injunction restraining the cancellation of the solicitation under Program 114–S was heard, and was granted after a hearing on October 7, 1983. About that time and thereafter, defendant moved to dismiss and for summary judgment on October 3 and 20, 1983. These motions were subsequently denied by this court in an opinion filed on December 23, 1983, which held, *inter alia*, that a genuine issue of fact existed with respect to whether a $1.2 million cost savings existed. *See International Graphics*, 4 Cl.Ct. at 196.

On January 12, 1984, defendant moved to suspend the proceedings to February 24, 1984, in order to complete an evaluation of the costs of Program 114–S in accordance with A–76. In said motion, defendant acknowledged that "there were some respects in which the GPO did not follow OMB Circular A–76 in its conduct of the Program 114–S solicitation," because it did not originally intend itself to be bound by A–76. It further admitted that "GPO's existing figures and evaluations are not amenable to study or comparison in terms of OMB Circular A–76," and that "if [its new A–76] evaluation concludes it would be more cost effective to contract out publication of the CBD, GPO will take all appropriate steps to restore the solicitation and award the contract to the lowest responsive responsible bidder." This motion was denied in a memorandum order filed January 20, 1984, on the grounds that (a) a suspension of proceedings could extend the resolution of this case for an intolerable period, and (b) defendant would, notwithstanding the denial, have more than the 43 days it requested, in order to do the necessary A–76 study, between the date of its motion and the initial trial date.

After one short continuance of the trial date (from February 27 to March 1, 1984) and a concomitant extension of time for the submission of proposed exhibits and contentions of law and fact, the parties submitted their proposed exhibits by February 27, 1984. Included in defendant's proposed exhibits, as the apparent mainstay of its case, was a recently completed cost comparison by the GPO for Program 114–S, ostensibly prepared pursuant to the August 1983 updated version of A–76. Plaintiff then filed subject motions *in limine* on February 29, 1984 (the day prior to the scheduled trial) and on March 1, 1984 (after a continuance of the trial date had been ordered by the court), praying that the designated documentary evidence and related testimony be excluded from evidence, at the trial, under Rules 402 and 403 of the Federal Rules of Evidence (FRE).[6] The

---

5. Plaintiff's letter made no mention of whether it thought that the 1979 (revised) or the 1983 updated versions of A–76 should apply in determining the base of GPO's estimate against which all bids would be measured.

6. Rule 402, FRE, provides, *inter alia*, that "[e]vidence which is not relevant is not admissible." Rule 403, FRE, provides, *inter alia* that "[a]lthough relevant, evidence *may* be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of

grounds postulated for said position were that such evidence is irrelevant and would (a) unfairly prejudice the plaintiff, (b) confuse the issues, and (c) waste time.

## DISCUSSION

We observe, as our starting point, that a recent Claims Court decision has characterized the purpose of a motion *in limine* in the following manner:

A motion in limine is a useful tool to prevent a party before trial from encumbering the record with *irrelevant, immaterial* or *cumulative matters.* Such a motion enables a court to rule in advance on the admissibility of documentary or testimonial evidence and thus expedite and render efficient a subsequent trial. (Emphasis added.)

*Baskett v. United States,* 2 Cl.Ct. 356, 367–68 (1983). The courts and commentators favor the use of motions *in limine* in complex litigation as a means of "increasing trial efficiency and promoting improved accuracy of evidentiary determinations by virtue of the more thorough briefing and argument of the issues that are possible prior to the crush of trial." *Zenith Radio Corp. v. Matsushita Electric Industrial Co., Ltd.,* 505 F.Supp. 1125, 1140 (E.D.Pa. 1980); *see* authorities cited therein at 1141.

In the instant case, the parties appear to hold diametrically opposite points of view with respect to what the proper issue(s) shall be at the forthcoming trial. Plaintiff essentially takes the position that since defendant did not bid Lots 1 and 2 (but merely adopted the lowest bid of the lowest bidders for same) for purposes of determining whether it was justified in cancelling the solicitation, based on the alleged compelling need, defendant should be permitted simply to "correct" (not re-estimate *ab initio*) its bid on Lots 3 and 4 consistent with OMB Circular A–76, prevailing as of March 1982. With respect to Lots 1 and 2, plaintiff contends that fairness dictates that defendant not be permitted to *bid* lots *ab initio*, after all bids have been opened. So as not to offend the procurement pro-

cess, it suggests that defendant should adopt its (plaintiff's) lowest bid on Lots 1 and 2, aggregate same with defendant's "corrected" bids on Lots 3 and 4, and determine who is the lowest bidder by comparing the foregoing with plaintiff's lowest package bid.

Premised on the foregoing, plaintiff, in essence, takes the position that the only question before the court in the forthcoming trial on the merits is whether defendant's bid of September 15, 1983, modified and corrected in the foregoing manner respecting the four lots, is, in the aggregate, lower than plaintiff's package bid. Conversely, defendant admits that the study it made of the comparative costs of producing the CBD, prior to cancellation, was not done substantially pursuant to OMB Circular A–76, and therefore it has conducted an entirely new study pursuant to the *1983 version* (most recent) of the OMB Circular. Defendant thus intends to introduce its new study into evidence as the methodology utilized in establishing the compelling reason for cancelling the solicitation based on a $1.2 million savings. Plaintiff's motions *in limine* therefore come to the court for the appropriate purpose of seeking an order excluding all evidence at trial that reflects a post-bid opening estimate of the cost of in-house production of the CBD, as well as all evidence of a cost comparison pursuant to the August 1983 version of A–76. It is this evidence that plaintiff avers is prejudicial, will confuse the issues, and waste time.

### I.

In its first motion *in limine,* plaintiff contends that the defendant is bound, by the "Government procurement norm" and the then existing cost comparison principles of A–76, to conduct its cost comparison study *prior* to bid opening, and that any initial estimate (Lots 1 and 2) or "re-estimate" (Lots 3 and 4) of the government's costs subsequent to bid opening are therefore contrary to law and the implied con-

the issues, ... or by consideration of undue ...

waste of time ...." (Emphasis added.)

tract. This contention receives threshold support from the fundamental principle in federal procurement law governing competitive bidding, that bids should not be submitted when a bidder or bidders have had the opportunity to see the bids of others. *See* 41 C.F.R. ¶ 1–2.401 (1983); R. Nash and J. Cibinic, Federal Procurement Law 223 (3d Ed. 1977). It is also supported by the Cost Comparison Handbook (both the 1979 and 1983 versions) which contemplates that the in-house cost estimate will be prepared by the concerned government agency prior to bid opening. *See OMB Circular No. A–76*, Supplement I (1979), at 7, ¶ D(2) and appendix 3; *id.* (revised 1983), at IV–3, ¶ 2(g) and appendix A.

Defendant opposes plaintiff's position by contending that "all applicable authorities sanction the re-estimate of A–76 costs after bid opening." Underlying defendant's position is another pervading principle of federal procurement law, namely that "the policy of Congress [is] to promote economy, efficiency, and effectiveness in the procurement of goods, services and facilities by and for the executive branch of the Federal Government . . . ." Pub.L. 91–129, 83 Stat. 269 (1969); *see also* R. Nash and J. Cibinic, *supra*, at 487. Therefore, defendant posits that a re-estimate of government costs of performing a contract should be permitted, even after bid opening, if the government reasonably believes that the most economical option has not yet been properly determined.

At first blush, the present dispute reflects an apparent conflict between the foregoing two fundamental premises of government procurement law. However, the language of the 1979 and 1983 versions of the A–76 Cost Comparison Handbook clearly demonstrates that although it is intended that the government should compile its own costs prior to bid opening, the government *must* be given the opportunity to correct errors discovered in its cost comparison after bids have been opened. *See*

*OMB Circular No. A–76*, Supplement No. 1 (1979), p. 8, ¶ 6; *id.* (1983), p. I–12, ¶ E(4). This result is mandated by the overriding purpose of A–76—to assure the most "economical performance of Federal activities," through "a comprehensive and valid comparison of the estimated cost to the Government of acquiring a product or service by contract and of providing it with in-house, Government resources." *Id.* (1979), p. 1; *see id.* (1983), p. IV–1. Moreover, this result is in accord with the general Congressional policy that agencies are not obliged in all circumstances to utilize a competitive bidding system, but only must do so "to the maximum extent practicable." Pub.L. 91–129, *supra*.

 In accord with this directive, decisions of the General Accounting Office (GAO), which have found A–76 cost comparisons erroneous, have consistently held that the agency that made the study should adjust its in-house cost estimate to reflect the effect of the correction of the error. *See, e.g., Trend Western Technical Corporation*, B–212410.2 84–1 CPD ¶ 29 (1983); *Contract Services Co.*, B–208180.2, 83–2 CPD ¶ 331 (1983); *Satellite Services, Inc.*, B–207180, 82–2 CPD ¶ 474 (1982). The reasoning underlying the GAO decisions, with which this court agrees and adopts,[7] was stated as follows in the *Trend Western* case, *supra:*

> Implicit in our decision [to permit the government to correct its in-house cost estimate *after bid opening*] is the recognition that a government estimate provides a standard against which bids and proposals are evaluated. *The government estimate thus is not subject to the same rules as are bids and proposals,* such as the requirement that a bid be responsive. . . . Therefore, we cannot question the Army's position on its authority to correct the government estimate. (Emphasis added.)

We note that plaintiff does *not* challenge the authority of the government to make

---

**7.** It is well settled that while this court is not bound by the decisions of the Comptroller General, it can adopt the views contained therein.

*See, e.g., Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 63, 617 F.2d 590 (1980).

"adjustments" or corrections of a previously completed A–76 study *after* bid opening. Instead, it attempts to draw a sharp distinction between the "correction" of errors in a pre-bid A–76 cost comparison study, which it concedes to be legitimate, and the initial estimation and/or "re-estimation" of in-house costs in a new A–76 study, which it strenuously contends to be contrary to law.[8] Plaintiff, therefore, takes strong exception to defendant's preparing an in-house estimate for Lots 1 and 2, as well as the completion of the portion below Line 9 of the 1979 A–76 cost comparison form,[9] because, prior to bid opening, the GPO did not submit bids on the first two lots and did not make the adjustments to its in-house cost estimate required by the portion below Line 9 of the 1979 cost comparison form. Plaintiff cites no authority for the foregoing distinction it makes, aside from the fact that the pertinent GAO decisions have expressly permitted adjustments or corrections to A–76 cost comparisons but have made no mention of "re-estimations".

Plaintiff thus apparently seeks an order from this court to the effect that defendant's so-called "ex post facto" A–76 study is so unfair and prejudicial, as to be abusive of the procurement process, that defendant should be precluded from introducing it into evidence. We hasten to point out that the short answer to the foregoing is that the pleadings, affidavits, and evidence brought thus far to the court's attention belie such a hospitable conclusion. To the contrary, even though defendant now concedes that it did not conform substantially to the procedures of an A–76 study prior to its cancellation of October 3, 1983, the record indicates that such omission has consistently been premised on the good

faith belief that it was not "bound" by A–76. This belief was expressed by GPO representatives, at the pre-proposal conference of March 9, 1982, *ante litem motam*, and was reiterated in statements on the record by various GPO officials in September and October, 1983. For example, according to the testimony of the contracting officer for Program 114-S, the GPO only believed that it was obligated to compare the overall cost of performing the contract in-house with that of the lowest private bidder(s), without having to follow *in toto* the technical cost comparison methodology of A–76.

■ This perception of the responsible GPO official was also apparently based on the fact that A–76 does not apply to legislative agencies such as the GPO, as well as the specific language in A–76 excepting printing and binding activities under Title 44 from its coverage. *See OMB Circular A–76*, ¶ 6(d)(6) (1979); *id.*, ¶ 7(b) (1983). In light of the foregoing facts and circumstances, as well as the presumption of regularity that attaches to actions of government officials, at this posture, no persuasive facts have been adduced to compel this court to find that defendant has so abused the procurement process as to preclude it from introducing evidence of its most recent A–76 study. In the circumstances of this case, a heavy burden is on the movant to so show and we find such a showing to be wanting. *See Kalvar Corp. v. United States*, 211 Ct.Cl. 192, 197–98, 543 F.2d 1298 (1976).

The ultimate question in subject litigation is whether defendant had a "compelling reason" to cancel the solicitation under Program 114-S, pursuant to the GPO's

---

**8.** Plaintiff specifically objects to a "re-estimation" of the in-house costs on Lot 3 and 4 (the only lots of Program 114-S on which the GPO made pre-bid estimates of its in-house costs) and an estimation, *ab initio*, on Lots 1 and 2 after bids have been opened.

**9.** The portion of the 1979 cost comparison form below Line 9, captioned "Performance by Contracting-Out (Chapter IV)", encompasses adjust-

ments in the low bidder's contract price so as to include additional government costs that would be incurred from contracting out, such as contract administration and conversion costs, and deduct items such as federal income taxes that would be collected from the low bidder. This portion of the 1979 cost comparison form is comparable to the portion of the 1983 cost comparison form below Line 6.

Printing Procurement Regulations.[10] *See International Graphics*, 4 Cl.Ct. at 196. The subsidiary question thereto is how and by what method may defendant prove said fact. Defendant initially claimed that its decision to cancel the solicitation was justified by a cost savings of $1.2 million that would be effected thereby, and that it was not bound to follow A–76 in making its determination of cost savings. Following the issuance of this court's opinion on December 23, 1983, holding that defendant was bound to comply with the fundamental cost comparison principles of A–76 before it could cancel the solicitation because of cost savings achieved thereby, defendant conceded that its initial cancellation decision was not made pursuant to a defensible A–76 study. Hence, it subsequently undertook to perform such a study, committing itself, concomitantly, to award the contract to the lowest responsible/responsive private bidder if it found that outsourcing the contract was justified under the cost comparison principles of A–76.[11] This court has found nothing contained in the general body of applicable procurement law (or in the cost comparison principles of A–76), nor has plaintiff so shown, which would prohibit defendant from exercising this statutory prerogative.

## II.

Plaintiff's second motion *in limine* requests that the court exclude all of defendant's evidence (documentary and testimonial) pertaining to a cost comparison under Program 114–S which uses or relies upon the 1983 revised version of A–76. Instead, plaintiff contends that the proper methodology for determining the in-house cost and the standard for all cost comparisons of producing the CBD by defendant should be the 1979 version of the Circular, as amended until 1982.

Plaintiff's position, seemingly, is premised primarily on this court's holding of December 23, 1983, that while A–76 does not apply *per se* to the GPO, the "cost comparison principles" of A–76 were incorporated into the implied contract of fairness running between the government and plaintiff. Consequently, it argues, in effect, that A–76 is only significant in subject solicitation to the extent that its cost comparison principles were incorporated into the foregoing implied contract, and that the events which give rise to said implied contract occurred either in February 1982, when the solicitation under Program 114–S was disseminated, or in March 1982, when plaintiff's representative was allegedly given a copy of the then-prevailing version of A–76 (*i.e.*, 1979) by the GPO's contracting officer. Hence, plaintiff argues that the subsequent revision of A–76, which became effective on August 4, 1983, had no legal effect on the implied contract between the parties, and therefore is not relevant to any present issue before this court.

■ While it is true that the sole legal significance of A–76 in subject litigation is that its "fundamental cost comparison principles" were incorporated by reference into the implied contract of fairness under Program 114–S, plaintiff has no sustainable basis for contending that said implied contract arose in 1982. The implied contract on which plaintiff must rely is, of course, implied in fact, since this court has no jurisdiction over a contract implied in law. *Merritt v. United States*, 267 U.S. 338, 341, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925); *Algonac Mfg. Co. v. United States*, 192 Ct.Cl. 649, 674, 428 F.2d 1241 (1970). The requirements for such an implied-in-fact contract were summarized, in pertinent part, as follows in *Prevado Village Partnership v. United States*, 3 Cl.Ct. 219, 223–24 (1983):

---

**10.** Specifically, the GPO is required to have a "compelling reason" for cancellation by GPO Printing Procurement Regulation, § IV.2.

**11.** In essence, defendant has thus acted to correct an error, albeit a major error, in the initial cost comparison it made prior to cancellation, which, on these facts, is within the ambit of permissible agency actions under the *Trend Western* line of GAO cases, *supra*.

To carry its burden in proving [the existence of an] implied-in-fact [contract], plaintiff must show the same mutual intent to contract, as well as the absence of any ambiguity in the offer and acceptance, as is required for an express contract. Plaintiff must show an agreement based upon a meeting of the minds that can be inferred, as a fact, from the conduct of the parties under existing circumstances which manifests their tacit understanding. *A definite offer by one party and an unconditional acceptance by the other must be established to show an implied-in-fact contract.* (Citations omitted.)

(Emphasis added.) *See also Baltimore & Ohio R.R. v. United States*, 261 U.S. 592, 597, 43 S.Ct. 425, 426, 67 L.Ed. 816 (1923); *Algonac Mfg. Co.*, 192 Ct.Cl. at 673–74, 428 F.2d 1241.

■ In the context of the implied contract of fairness, the solicitation of February 24, 1982 can only be considered to be an "offer." The "acceptance" does not take place until the bids are submitted, because it is only then that there is a mutuality of intent to contract between the government and bidders. Moreover, "[i]t is the plaintiff's compliance with the solicitation that forms the consideration for the implied contract of fair dealing." *Ingersoll-Rand Co. v. United States*, 2 Cl.Ct. 373, 376 (1983). Hence, the implied contract of fairness between the government and bidders only arises upon the submission of bids. *Id.; see also Alabama Metal Products v. U.S.*, 4 Cl.Ct. 530 at 533 (1984).

■ Although the solicitation in the instant case was issued on February 24, 1982, bids were not submitted until September 15, 1983. Thus, the implied contract of fairness with plaintiff in subject litigation arose on September 15, 1983, 42 days *after* the effective date (August 4, 1983) of the 1983 revision of A–76. Consequently, even if the theory were accepted that defendant's cost comparison must be made under the prevailing version of A–76 at the time the implied contract of fairness arose, defendant would not be restricted from utiliz-ing the recent updated 1983 revision of A–76 in its cost comparison, since the implied-in-fact contract arose *after* the promulgation of the latest revised A–76.

Moreover, plaintiff has no justifiable basis for contending that because some of the events that "gave rise to" subject implied contract occurred in February and March 1982, defendant should be restricted from applying all revisions of A–76 issued subsequent to that time. The solicitation that formed the basis for said implied-in-fact contract clearly indicated that the GPO's "cost/feasibility analysis" would be conducted "as outlined in OMB Circular No. A–76," but was void of any indication as to which version of A–76 would be applicable. In interpreting such ambiguous provisions, it is axiomatic that:

The primary objective of contractual interpretation is to ascertain and give effect to the mutual intention of the contracting parties, and to this end a contract should be appraised as a whole— *giving just consideration to the fundamental purposes of the parties and the surrounding factual circumstances at the time of execution.* (Emphasis added.)

*Micrecord Corp. v. United States*, 176 Ct.Cl. 46, 53, 361 F.2d 1000 (1966). On the other hand, this court has usually adopted the contractor's interpretation of an ambiguous contract drawn by the government, *contra proferentum, if, and only if,* the contractor actually and reasonably relied upon that construction at the time the contract was entered into. *See Randolph Engineering Co. v. United States*, 176 Ct.Cl. 872, 876, 367 F.2d 425 (1966). Assuming arguendo a claim of reliance, the question then is whether plaintiff, on the facts of this case, was reasonable in believing (at the time its bid was submitted on September 15, 1983) that defendant intended to utilize the cost comparison provisions of the 1979 version of A–76, rather than the 1983 version, in determining its in-house costs.

The record, with respect to subject solicitation, shows that the fundamental objec-

tive of the government was clearly to determine, in the most efficacious manner, whether contracting out the production and distribution of the CBD or retaining same in-house was more cost-effective for the government. In view of the complexity entailed in such a determination, it is most reasonable to construe subject solicitation to mean that the government intended to utilize the most accurate state-of-the-art techniques available in making its cost comparison under A–76 (and no creditable evidence surfaced indicating that prospective bidders failed to so understand). The GPO's use of the recent 1983 revision of A–76, which was clearly meant to facilitate greater accuracy and simplicity in cost comparisons, would be most consistent with the foregoing interpretation. *See* 48 Fed.Reg. 1376 (1983). In this connection, it is especially significant to note that the Federal Register placed bidders on notice as early as January 12, 1983, of proposed changes in the 1979 version of A–76.

This court is of the view that plaintiff must be held accountable for all knowledge affecting Program 114–S that would flow to a reasonably cognizant person at the time it submitted its bid on September 15, 1983. Against the foregoing background, it strains credulity that plaintiff could reasonably believe, at the time of submission of its bid, that defendant in applying the principles of A–76 would not follow the then-existing updated 1983 version of A–76. Moreover, it is apparent from all of plaintiff's submissions after bid opening, prior to this court's opinion of December 23, 1983, that plaintiff did not specifically rely on either the 1979 or 1983 versions of A–76 to the exclusion of the other, but instead referred to both versions while expressing no preference for either one.[12] On these facts, this court must hold that plaintiff did not actually and reasonably rely, *at the time of the submission of its bid*, on the

1979 version of A–76 as being applicable to defendant's cost comparison.

Consequently, plaintiff's attempts to make much of the alleged fact that defendant's contracting officer furnished its representative with the 1979 version of the A–76 Circular upon his request in March 1982, even if assumed to be true, in no respect limit the government's ability to utilize the more recent version of A–76 in its ultimate cost comparison analysis.

Plaintiff also makes two other arguments that the 1979 version of A–76, rather than the 1983 version, should apply. First, it states that the government's initial A–76 study was in progress prior to the August 4, 1983 effective date of the 1983 version. Consequently, it argues that the following language from ¶ 12 of the 1983 Circular mandates that the earlier 1979 version be applied:

> This Circular and its supplements are effective immediately but *need not* be applied where a cost comparison was begun, using the March 1979 Circular, prior to the effective date [ (August 4, 1983) ]. (Emphasis added.)

This argument is totally without merit. This court interprets the phrase "need not" to mean "may," that is to say, it is discretionary with the agency. Therefore, the only effect of the literal language of the Circular cited above is to permit the government to continue an A–76 study under the 1979 Circular if such was in progress as of August 4, 1983. Nothing contained in ¶ 12 or any other part of A–76 *precludes* the government from applying the 1983 version of the Circular.

Secondly, plaintiff lists a number of instances in the defendant's preliminary motions, as well as the preliminary hearings, in which defendant referred to the 1979 version of the Circular. Consequently, plaintiff contends that these uses of the 1979 Circular constitute a "contemporane-

---

**12.** For example, in its motion for a preliminary injunction, in which plaintiff asserted that the GPO did not comply with A–76, it cited the 1979 version "[f]or brevity's sake, ... except where there appear to be differences [with the 1983 revision] which might be significant in this action." Elsewhere in its motion, where the 1983 revision differed from the 1979 version, plaintiff cited the two versions, without expressing a view of which version should be applicable.

ous interpretation" by the GPO of the implied contract, which "conclusively confirms" that the 1979 Circular here pertains. This contention is equally devoid of substance. Throughout the period before the disposition of its motion for summary judgment, defendant unswervingly took the position that the GPO was *not* bound to conform to *any* version of A–76, and all references it made to the 1979 Circular were in support of this contention.

Moreover, the references made to the 1979 version of A–76 by defendant were only made in response to plaintiff's assertions, using the 1979 version of the Circular, that the GPO was bound by the principles of A–76. It is clear that plaintiff's assertions, at this time, were made using the 1979 version "[f]or brevity's sake." *See* note 12, *supra*. Given the foregoing circumstances, this court will not deem defendant's references to the 1979 version of A–76 as a "contemporaneous interpretation" of same, but only as references similarly made for brevity's sake.[13] Consequently, defendant's current use of the updated 1983 A–76 Circular in its pretrial submissions cannot be deemed to constitute a "blatant and arbitrary change of position ... [which] demonstrates bad faith," as claimed by plaintiff.

## CONCLUSION

For the foregoing reasons, plaintiff's first and second motions *in limine* are denied. Accordingly, at the forthcoming trial on the merits, defendant shall be permitted to introduce evidence, documentary and otherwise, of its more recent A–76 cost comparison, and will also be permitted to utilize the provisions of the 1983 revision of A–76 as a standard for determining whether the cost savings it projects would result in fact from the cancellation of subject solicitation.

IT IS SO ORDERED.

**13.** In this connection, it is noteworthy that those portions of the 1979 Circular cited by defendant in its preliminary motion of October 3, 1983 and the hearing of October 7, 1983 were retained in virtually identical form in the 1983 Circular.